## Commonwealth vs. Timothy S. Moran
## (and three companion cases[1]).

Berkshire. February 2, 1982. — November 18, 1982.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & O'Connor, JJ.

*Homicide. Robbery. Felony-Murder Rule. Practice, Criminal,* Trial of
defendants together.

Where the evidence at the joint trial of two defendants charged with un-
armed robbery permitted the inferences that one of the defendants
knew that the victim had money, that he directed his codefendant to
stop the victim, that he assaulted the victim with the intent to take his
money, and that he took the money either as principal actor or as joint
venturer with the codefendant, the jury were warranted in finding
that each element of the crime of robbery had been proved as to that
defendant beyond a reasonable doubt. [646-647]
The felony-murder rule as defined by the common law of Massachusetts
does not violate the due process clause of the Fourteenth Amendment
to the United States Constitution by reason of introducing a conclusive
presumption of the mental state required for murder. [647-650]
Failure of the judge at a criminal trial to instruct the jury that the felony-
murder rule applies only if they find, from the circumstances of the
underlying felony, that the defendants consciously disregarded risk to
human life was error requiring reversal of murder convictions based
on the felony-murder rule. [650-651]
Where the only defenses put forward by two codefendants on trial for
murder and unarmed robbery were mutually antagonistic and irrec-
oncilable, the prejudice to each, as the result of a joint trial, was com-
pelling; the judge's denial of one defendant's timely motion to sever,
renewed at the point in the trial when the need for severance had been
firmly established, was an abuse of his discretion [651-660]; and, in
the circumstances, substantial justice also required reversal of the
other defendant's conviction [660-661].

Indictments found and returned in the Superior Court
Department on September 3, 1980.

[1] One is against Timothy S. Moran; two are against Matthew A. Chenail.

The cases were tried before *Simons, J.*

*John B. DeRosa (David E. O'Connor & Michael J. Ripps* with him) for Timothy S. Moran.

*David O. Burbank* for Matthew A. Chenail.

*Daniel A. Ford,* Assistant District Attorney, for the Commonwealth.

O'CONNOR, J.  The defendants appeal from convictions, following a jury trial, of murder in the first degree and unarmed robbery.  The murder convictions were based on the felony-murder doctrine.  The defendants argue that that doctrine, as it has previously been applied in this Commonwealth, is unconstitutional and therefore that it was error for the judge to instruct the jury on felony-murder.  We hold that the doctrine is constitutional.  However, we examine the felony-murder doctrine as it applies to the common law felony of unarmed robbery, and hold that it was error to instruct the jury that the malice necessary to convict of murder is supplied solely by participation in an unarmed robbery.  Accordingly, we reverse the murder convictions. We also reverse the unarmed robbery convictions on the ground that severance of the trial of the defendants was required.  We affirm the denial of Moran's motions for required findings of not guilty.

We recite some of the facts that the jury could have found, reserving others for discussion in conjunction with specific issues raised.  The defendants briefly conversed with the victim, William Wronski, outside a bar in Adams on the evening of August 14, 1980.  Following that conversation, Wronski and the defendants entered the bar, and Wronski bought them one or more drinks.  Wronski left the bar and walked up the street to his pick-up truck.  The defendants left the bar and followed Wronski up the street. There was a confrontation at the truck.  One or both defendants hit Wronski several times about the head.  The defendants placed Wronski in the cab of his truck.

Wronski was intoxicated and had recently eaten a full meal.  Because of this intoxication, the blows to his head, and the position of his body in the truck, Wronski vomited

some time that night, aspirated the vomit, and was asphyxiated. His body was discovered in the truck the next morning. Wronski's wallet, containing no money, was found in a nearby river a day later.

1. *Sufficiency of the evidence.* At the close of the Commonwealth's case, Moran moved for required findings of not guilty on the charges of unarmed robbery and murder. The motions were denied, and Moran appeals, contending that the evidence introduced by the Commonwealth was insufficient for the jury to conclude that he intended to take or did take Wronski's wallet, or that he formed such an intent before or during the assault. Based on these contentions, Moran argues that he would not be guilty of either robbery or felony-murder predicated on robbery.

Robbery may be punished more severely than larceny from the person. Compare G.L. c. 265, § 19, with G. L. c. 266, § 25. The principal policy served by this greater punishment is deterrence of the use of force (and the accompanying risk to human life) to obtain money or other property. See M.C. Bassiouni, Substantive Criminal Law 336 (1978). This policy is not served where the intent to steal is not formed until after the assault. We conclude, therefore, that where the intent to steal is no more than an afterthought to a previous assault, there is no robbery. See *Commonwealth* v. *Rego,* 360 Mass. 385 (1971); *Commonwealth* v. *Novicki,* 324 Mass. 461, 464 (1949); *Commonwealth* v. *Weiner,* 255 Mass. 506, 509 (1926). We hold, however, that there was sufficient evidence to warrant a finding that the intent to steal was not an afterthought.

Evidence of the following facts was admitted against Moran as part of the Commonwealth's case to prove his participation in the robbery. On the evening of his death, Wronski had at least $70, which he had put into his wallet, and with which he bought one or more drinks for the defendants in the bar. After Wronski had left the bar and had walked toward the truck, Moran emerged from the bar and told Chenail to go and get Wronski because he owed them another drink. Chenail and Moran then both jogged after

Wronski. Two witnesses driving by saw someone wearing clothing like that worn by Moran, punching another person inside the truck. Wronski's body was found the next morning, and his wallet without money was found in a nearby river a day later.

Moran argues that this evidence shows only that he had an opportunity to take Wronski's wallet and does not permit an inference that he either intended to or did take it, or that he formed such an intent before or during the assault. We disagree. Criminal intent generally can be proved only by inferences from facts, and those inferences need only be reasonable. *Commonwealth* v. *Casale,* 381 Mass. 167, 173-174 (1980). The evidence warranted inferences that Moran knew Wronski had money, that he directed Chenail to stop Wronski in order to obtain more to drink, that he assaulted Wronski with the intent to take his money, and that he took the money, either as principal actor or as joint venturer with Chenail. See *Commonwealth* v. *Ambers,* 370 Mass. 835, 839 (1976). Here, as in *Commonwealth* v. *Blow,* 370 Mass. 401, 407 (1976), the evidence was sufficient for the jury to "find that [the defendants] . . . formed a plan to rob [the victim], or had, at least, an understanding to take advantage of an intoxicated [man] that encompassed a probability of robbery." We hold that the evidence was sufficient to satisfy a rational trier of fact beyond a reasonable doubt of each element of the crime of robbery. *Commonwealth* v. *Toney,* 385 Mass. 575, 582 (1982). *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979). Moran's motions for required findings of not guilty of unarmed robbery and of murder based on the felony-murder rule, grounded on the contention that there was insufficient evidence of unarmed robbery, were correctly denied.

2. *Constitutionality of the felony-murder rule.* Both defendants were tried and convicted of murder based solely on the application of the felony-murder rule. They objected to the judge's instructing the jury on felony-murder, arguing that felony-murder "as structured in Massachusetts" is unconstitutional. The defendants' argument is based on *Sand-*

*strom* v. *Montana,* 442 U.S. 510 (1979). In that case the defendant was convicted of "deliberate homicide," in that he "purposely or knowingly" caused a death. *Id.* at 512. The defendant's purposeful state of mind with respect to the death was the critical issue. *Id.* at 520-521. The jury were instructed that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 515. In reversing the conviction the Supreme Court held that this charge violated the Fourteenth Amendment's requirement that the State prove every element of a crime beyond a reasonable doubt. *Id.* at 524, 527. The defendants here contend that the felony-murder rule violates this constitutional requirement because it presumes the mental state required for murder from the intent required for the underlying felony.

The felony-murder rule is that a homicide committed in the commission or attempted commission of a felony is murder. The rule is defined by common law and is the law of this Commonwealth. *Commonwealth* v. *Matchett,* 386 Mass. 492, 502 (1982). *Commonwealth* v. *Ambers,* 370 Mass. 835, 839 (1976). *Commonwealth* v. *Rego,* 360 Mass. 385, 395 (1971).[2] The defendants argue that murder is an unlawful killing with malice aforethought, *Commonwealth* v. *Campbell,* 375 Mass. 308, 312 (1978); *Commonwealth* v. *Amazeen,* 375 Mass. 73, 80 (1978); *Commonwealth* v. *Webster,* 5 Cush. 295, 304 (1850), and that malice aforethought consists of unexcused intent to kill, to do grievous bodily harm, or to do an act creating a strong and plain likelihood that death or grievous harm will follow, *Commonwealth* v. *Huot,* 380 Mass. 403, 408 (1980); *Commonwealth* v. *Chance,* 174 Mass. 245, 252 (1899). The defendants contend that, by conclusively presuming one of these three intentions, the felony-murder rule relieves the Commonwealth of proving an essential element of murder, in

[2] General Laws c. 265, § 1, does not define the crime of murder nor establish the felony-murder rule. *Commonwealth* v. *Ambers,* 370 Mass. 835, 839 (1976). *Commonwealth* v. *Rego,* 360 Mass. 385, 395 (1971).

violation of the Fourteenth Amendment to the United States Constitution and contrary to *Sandstrom*.

We have said that "[t]he effect of the felony-murder rule is to substitute the intent to commit the underlying felony for the malice aforethought required for murder." *Commonwealth* v. *Matchett, supra*. This statement suggests that malice aforethought is not an essential element of murder in the circumstances of a homicide occurring in the course of a felony. See *People* v. *Aaron*, 409 Mich. 672, 740-742 (1980) (Ryan, J., concurring in part and dissenting in part) ("Malice has nothing to do with common-law felony murder; it is not an element of the crime, and is not properly considered by the jury." *Id.* at 742). We have also held, however, that felony-murder does require malice aforethought. *Commonwealth* v. *Gricus*, 317 Mass. 403, 412 (1944). See *Commonwealth* v. *Balliro*, 349 Mass. 505, 512 (1965). In *Commonwealth* v. *Madeiros*, 255 Mass. 304, 310, 315 (1926), we approved a jury instruction that "[w]here a defendant is engaged in the commission or attempted commission of some crime of the degree of felony — that is, a crime punishable by death or imprisonment in the state prison — and some act done by him in the commission or attempted commission of such felony results in the death of some person, the killing is with 'malice aforethought' within the meaning of the law, and the killing is murder, although the defendant did not intend to kill or even to harm the deceased. The intention to commit some other felony amounts to 'malice aforethought' making the crime murder." See also *Commonwealth* v. *Gricus, supra* at 411; *Commonwealth* v. *Chance, supra* at 252-253; *People* v. *Aaron, supra* at 714-717; W.R. LaFave & A.W. Scott, Jr., Criminal Law 528 (1972). Assuming, therefore, as the defendants contend, that our common law requires malice aforethought for every type of murder, in felony-murder the intent to commit the underlying felony *is* the required malice aforethought. Our long-standing recognition of a type of malice aforethought peculiar to felony-murder is not inconsistent with our definition of malice aforethought in the nonfelony-

murder context. No presumption of malice aforethought is necessary or operative under the felony-murder rule. The rule is not constitutionally infirm. See *Commonwealth* v. *Hicks*, 377 Mass. 1, 10 (1979); *Commonwealth* v. *Watkins*, 375 Mass. 472, 485-488 (1978).

3. *Applicability of the felony-murder rule.* We observed in *Commonwealth* v. *Matchett*, *supra* at 504-505, that "[t]his court has never automatically applied the felony-murder rule without viewing the facts of the case" and that "[w]e have never delineated exactly which felonies give rise to application of the rule." In *Matchett*, we held that, where the underlying felony is extortion, the defendant cannot be convicted of murder based on the felony-murder rule, unless the jury find that the extortion involved circumstances demonstrating the defendant's conscious disregard of the risk to human life. *Id.* at 508. Since trial of the present case was completed before *Matchett* was decided, and substantial justice requires proper application of the felony-murder rule, we review the judge's jury instructions on felony-murder even though the defendants' objection was to the constitutionality of the rule and not to its common law application to the facts of this case. *Commonwealth* v. *Stokes*, 374 Mass. 583, 587-589 (1978). *Commonwealth* v. *Freeman*, 352 Mass. 556, 561-564 (1967). *Commonwealth* v. *Conroy*, 333 Mass. 751, 757 (1956).

The holding in *Matchett* was based on our recognition that extortion can be committed without danger to human life and on the principle that "criminal liability for causing a particular result is not justified in the absence of some culpable mental state in respect to that result." *Matchett*, *supra* at 507, quoting from Gegan, Criminal Homicide in the Revised New York Penal Law, 12 N.Y.L.F. 565, 586 (1966). "A felony-murder rule that punishes [as murder] all homicides committed in the perpetration of a felony whether the death is intentional, unintentional or accidental, without the necessity of proving the relation of the perpetrator's state of mind to the homicide, violates [this] most fundamental principle . . . ." *Matchett*, *supra* at 506-507.

Though *Matchett* involved only felony-murder based on extortion, its principle applies as well to felony-murder based on unarmed robbery. Unarmed robbery is not inherently dangerous to human life. Purse snatching can be robbery, see *Commonwealth* v. *Jones*, 362 Mass. 83, 89 (1972), but it need not be dangerous to life. Punishing as murder homicides that result from such crimes without proof of a culpable mental state with respect to the killing violates the *Matchett* principle. Accordingly, we hold that, where the underlying felony is unarmed robbery, the felony-murder rule applies only if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life.

The judge instructed the jury that the "malice aforethought that is required in murder is supplied by the participation in a felony so serious as to call for life imprisonment." Because the judge gave no instruction that the jury must find conscious disregard of risk to human life in order to apply the felony-murder rule, we reverse the murder convictions.[3]

4. *Severance.* Before trial Moran moved for severance of his trial from that of Chenail. The following reports of oral statements made by Chenail to the police were made known to the judge at the hearing on the motion. A report written by Officer Stanley Misiuk stated: "Chenail told me that he did observe Wronski at Chick's sitting right next to Timothy Moran and two seats from him. It seems Moran was arguing with Wronski about buying some drinks. Wronski left the bar at about 11:30 P.M. and Chenail and Moran followed. Chenail said he stayed by Chick's while Moran headed south on Columbia Street toward Wronski. Chenail then went south on Columbia Street and caught up with Moran but Wronski was already in his truck. Wronski got

---

[3] The rule we announce today applies to cases that are pending on direct appeal or as to which the time for direct appeal has not expired on the date of this decision. Our decision does not provide a basis for collateral attack of final judgments. See *Linkletter* v. *Walker*, 381 U.S. 618, 627-629, 636-640 (1965); *Reddick* v. *Commonwealth*, 381 Mass. 398, 400-404 (1980).

out of his truck and he and Moran were arguing. Moran started shoving Wronski and they fell to the ground. Wronski got back up and both he and Chenail pushed Wronski around a little bit. Chenail then left and went to Moran's car which was parked in the Town House parking lot. Chenail said Moran returned with Wronski's wallet and they split twenty dollars. They then drove to North Adams where they traveled west on Route 2, State Street, until they came to a bridge right before Mt. Greylock Bowl, where Moran stopped the car on the bridge, got out and threw the wallet into the Hoosac River on the north side of the bridge. Chenail said he did not lay a hand on Wronski, but does not want to implicate anyone else. Chenail did admit to spending the money." The following statement was reportedly made by Chenail to State Police Lieutenant Roy F. Sibley: "I'll admit to my part as far as the wallet, but I know nothing about any beating or killing." In response to Lieutenant Sibley's question as to how much money he got, Chenail reportedly said, "Twenty — we split twenty dollars." Although the statements contained admissions that Chenail was at Wronski's truck at a relevant time and that Chenail pushed Wronski around and shared in the money taken from Wronski's wallet, the primary effect of Chenail's statements was to exculpate Chenail and inculpate Moran. According to the statements, Moran took Wronski's wallet in Chenail's absence and any significant beating of Wronski took place after Chenail left Moran with Wronski. The judge was also told that the Commonwealth planned to introduce evidence that Moran was asked by an inmate at the Berkshire County house of correction, "[W]ho did you kill?", and Moran replied, "[S]ome retarded jerk that needed it for a long time . . . so we did him the favor."

Moran argued that Chenail's statements would be offered by the Commonwealth against Chenail, that they would seriously prejudice Moran despite any instruction that the jury should only consider them in the case against Chenail, and that Moran was not assured of an opportunity to cross-examine Chenail, and thereby would be denied his Sixth

Amendment right to confront witnesses against him. See *Bruton* v. *United States,* 391 U.S. 123 (1968). The judge ruled that the testimony of the Commonwealth's witnesses relative to Moran's and Chenail's extrajudicial statements, on direct examination, should be edited to eliminate references to Moran in Chenail's statements and references to Chenail in Moran's statement.[4] However, Chenail's counsel contended that the deletion of the inculpation of Moran from Chenail's statement as reported by Officer Misiuk distorted the statement unfairly to Chenail. He insisted on the right to elicit from the witnesses on cross-examination his client's full, unedited statement inculpating Moran and thereby exculpating Chenail. Moran's counsel insisted that, if the Commonwealth introduced part of Moran's extrajudicial statement, he had the right to bring out the statement in its entirety, thereby inculpating Chenail. The judge declined at that time to limit this proposed cross-examination. None of the parties contended that this was error. Moran maintained that he could not fairly be tried with Chenail. The severance motion was denied. A subsequent pretrial motion for reconsideration also was denied.

---

[4] However, the judge's editing of the testimony of the Commonwealth's witnesses relative to Chenail's inculpatory extrajudicial statements was not sufficient to avoid *Bruton* problems. We expressed the view in *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 8 (1973), that a statement of a defendant that neither names nor plainly refers to a codefendant may nevertheless be inculpatory under *Bruton* if the codefendant otherwise easily can be connected with the statement. "[T]here is a danger that juries will make severe implications even from indefinite references, for association is all too easy with a defendant who is conspicuously present in court and who has already been in some way tied to the criminal episode." *Id.* at 8.

Here, one police officer was allowed to testify on direct examination by the prosecutor that Chenail had stated, "[H]e was still alive when *we* left him" (emphasis added). Another police officer, also on direct examination by the prosecutor, testified that when asked how much money he had gotten from Wronski's wallet, Chenail had responded, "Twenty. *We* split twenty dollars" (emphasis added). Both of these statements were inculpatory because the use of the term "we," in the circumstances of this case, clearly included reference to the other defendant. See *Commonwealth* v. *Sarro,* 356 Mass. 100, 101-102 (1969) (admission of statement by one of two defendants charged with auto theft that "[w]e are stealing them for parts" held reversible error under *Bruton*).

The prosecutor included in his opening statement at trial a recitation of expected evidence: that the defendants followed Wronski to his truck, that some violence occurred there at that time, that Wronski's wallet was taken, that Wronski sustained a fractured skull and multiple bruises to the face, and that he died, partially as a result of the trauma he had sustained. He recited the defendants' statements as edited in accordance with the judge's order. Near the end of his opening, the prosecutor said, "That, in essence, is the Commonwealth's case. . . . We don't have eye witnesses to these events. What we have are some admissions. What we have are witnesses who place Timothy Moran and Matthew Chenail in the company of William Wronski when civilian witnesses put a beating occurring in that position and that place." At the conclusion of the prosecutor's opening, Moran again moved for severance and the motion was denied.

Chenail's counsel made an opening statement immediately following that of the prosecutor. Chenail's counsel told the jury that Chenail would take the stand despite his right to remain silent and would testify that he accompanied Moran to Wronski's truck, that he saw Wronski lunge and saw Moran punch him once, and that after helping put Wronski back into the truck he left. Counsel also predicted that Chenail would testify that he knew nothing about the wallet until Moran joined him at the car. In short, the opening indicated that Chenail's testimony would parallel the full statement he gave to Officer Misiuk.

On direct examination by the Commonwealth, after a jury instruction limiting the evidence to Chenail's case, Officer Misiuk testified to Chenail's statement as edited by the judge's pretrial order. On cross-examination by Chenail, over Moran's objection, Officer Misiuk testified fully to Chenail's unedited statement inculpating Moran. During this cross-examination the judge again instructed the jury that the evidence was admissible only against Chenail. Moran unsuccessfully renewed his motion to sever and moved for a mistrial. Later, over Moran's objection, Lieutenant Sibley testified to Chenail's statement set forth above.

Moran's counsel gave his opening statement at the close of the Commonwealth's case. Moran and Chenail testified. Moran told the jury that he did hit Wronski once, but that he then turned away for a moment, and, when he looked back, Chenail was bending over the fallen Wronski, whose face was then bloody. He also testified that Chenail's hands were bloody and that it was Chenail who noticed the wallet and told him to take it. Chenail testified as his opening statement indicated.

Each defendant was cross-examined extensively by counsel for the other. Cross-examination brought out a number of inconsistencies in each defendant's testimony and reemphasized those portions of the Commonwealth's evidence that were particularly damaging to the defendant being cross-examined.

Because Chenail took the stand and was cross-examined by Moran's counsel, there was no denial of Moran's right to confront witnesses against him. *Bruton* v. *United States*, 391 U.S. 123 (1968). *Commonwealth* v. *Hicks*, 377 Mass. 1, 5 (1979). *Commonwealth* v. *Nolin*, 373 Mass. 45, 49 (1977). However, our inquiry as to the necessity of severance does not end there.

"If it appears that a joinder . . . of defendants is not in the best interests of justice, the judge may upon his own motion or the motion of either party . . . grant a severance of defendants, or provide whatever other relief justice may require." Mass. R. Crim. P. 9 (d) (1), 378 Mass. 859 (1979). This rule generally tracks Rule 14 of the Federal Rules of Criminal Procedure, which provides that "[i]f it appears that a defendant or the government is prejudiced by a joinder . . . of defendants . . . for trial together, the court may . . . grant a severance of defendants or provide whatever other relief justice requires." Numerous Federal decisions dealing with this rule are collected and discussed in Annot., 82 A.L.R.3d 245 (1978 & Supp. 1981).

In *United States* v. *Crawford*, 581 F.2d 489 (5th Cir. 1978), two defendants were convicted of possessing an unregistered sawed-off shotgun, in violation of 26 U.S.C.

§§ 5861(d) & 5871 (1976). The defendants had been appre-
hended while riding in an automobile containing the shot-
gun. The government contended that both defendants pos-
sessed the firearm. Each defendant claimed that the weapon
was possessed solely by the other. The defendants' motion
for severance was denied and this was held to be error re-
quiring retrial. The court acknowledged that the decision
whether to sever defendants for trial is within the trial
judge's discretion and that the decision of the trial judge
should not be overturned in the absence of an abuse of that
discretion. *Id.* at 491. The court ruled that "[t]o cause the
type of compelling prejudice that prevents co-defendants
from obtaining a fair trial [and that requires severance], the
defenses must conflict to the point of being irreconcilable
and mutually exclusive." *Id.* The court held that the de-
fenses asserted by the codefendants "were irreconcilable as
well as mutually exclusive." *Id.* at 491-492. The court rea-
soned that "[t]he sole defense of each was the guilt of the
other. Blanks [a codefendant] incriminated Crawford [a
codefendant] and exculpated himself at every opportunity.
Crawford, on the other hand, attempted to show that he
was not culpable because Blanks alone had possession of the
firearm. Each was the government's best witness against
the other. Each defendant had to confront not only hostile
witnesses presented by the government, but also hostile wit-
nesses presented by his co-defendant. Witnesses against
each defendant were thus examined by one adversary and
cross examined by another adversary. A fair trial was im-
possible under these inherently prejudicial conditions." *Id.*
at 492. See *United States* v. *Johnson*, 478 F.2d 1129 (5th
Cir. 1973) (conviction reversed for failure to grant sever-
ance, based on the same reasoning as that subsequently em-
ployed in *United States* v. *Crawford, supra*).

Other Federal Courts of Appeal have applied the rule and
reasoning of *Crawford*. In *United States* v. *Ziperstein*, 601
F.2d 281, 285 (7th Cir. 1979), cert. denied, 444 U.S. 1031
(1980), the court stated: "This circuit has a well-established
standard for determining when the claim of 'mutually antag-

onistic' defenses will mandate a severance. Such 'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." The Fourth Circuit also requires severance in cases of irreconcilable defenses. See *United States* v. *Becker,* 585 F.2d 703, 707 (4th Cir. 1978), cert. denied, 439 U.S. 1080 (1979).

In *Johnson* v. *United States,* 398 A.2d 354 (D.C. 1979), the trial judge had denied severance motions with the observation, "[T]hat's why you prosecute two people caught in the automobile at the same time. One hangs the other." *Id.* at 368. In reversing, the court held that the trial judge's rationale violated the principle of such cases as *Rhone* v. *United States,* 365 F.2d 980 (D.C. Cir. 1966), in which the court stated that codefendants must be granted severance when they offer conflicting and irreconcilable defenses such that the jury "will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* at 981.

Decisions of the courts of several States accord with the principle enunciated in the cases referred to above. In *People* v. *Hurst,* 396 Mich. 1 (1976), the court reversed a conviction where severance had been requested and denied by the trial judge. The court held that a "defendant is entitled to a trial separate . . . from a codefendant who it appears may testify to exculpate himself and incriminate the defendant seeking a separate trial." *Id.* at 4. See *State* v. *Holup,* 167 Conn. 240, 246 (1974) ("The defenses of the codefendants were not only incompatible but completely antagonistic"); *People* v. *Meisenhelter,* 381 Ill. 378, 388 (1942) ("Where defenses are antagonistic and one defendant accuses the other, thus making it impossible for the defendant asking for a severance to have a fair trial, the severance should be granted"); *State* v. *Thibodeaux,* 315 So.2d 769, 771 (La. 1975), quoting from *State* v. *Birbiglia,* 149 La. 4, 30 (1921) ("There is no case more appropriate for the granting of a severance . . . than a case where each defendant attempts to put the blame upon the other").

In *Murray* v. *State,* 528 P.2d 739 (Okla. Crim. App. 1974), the defendants Murray and Grizzle were tried together and

convicted of murder in the second degree. They appealed, contending that the trial judge had erred in denying their motion to sever. The court reversed on the ground that "the respective defenses of Grizzle and Murray were mutually antagonistic." *Id.* at 739-740. The court noted that Grizzle's testimony and confession were such that only Murray could have done the shooting, while Murray's testimony and confession were such that only Grizzle could have done it. The court concluded that under such circumstances, where codefendant was pitted against codefendant and each was tried on the confession of the other, a fair trial was impossible.

In this Commonwealth severance is usually a matter within the sound discretion of the trial judge. *Commonwealth* v. *Cepulonis*, 374 Mass. 487, 499 (1978). *Commonwealth* v. *Hogg*, 365 Mass. 290, 296 (1974). Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice time and energy to serve upon juries, and avoids the necessity of recalling witnesses to successive trials. *Johnson* v. *United States, supra* at 367. Such considerations, however, must yield at some point to the rights of the accused. That point is reached when the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial. In such circumstances, and upon the making of a timely motion, failure to sever constitutes an abuse of discretion.[5]

This is not a case of codefendants merely pursuing inconsistent trial strategies, as in *Commonwealth* v. *Horton*, 376 Mass. 380, 390 (1978), cert. denied sub nom. *Wideman* v. *Massachusetts*, 440 U.S. 923 (1979), nor is it like *Common-*

---

[5] Unfairness to the defendant need not reach the level of deprivation of constitutionally guaranteed due process in order to require severance. In *Commonwealth* v. *McGrath*, 358 Mass. 314, 321 (1970), this court noted in dictum that "[a] motion for severance is within the discretion of the trial judge, unless severance is required by constitutional principles." To the extent this dictum in *McGrath* is contrary to our decision today, we do not follow *McGrath*.

*wealth* v. *French,* 357 Mass. 356 (1970), judgment vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972), in which we held that codefendants do not become entitled to severance "because of the possibility that they might wish to assert antagonistic defences or use different trial strategy." *Id.* at 376. Nor is this a case in which the only reason advanced for severance is hostility between the defendants or that a defendant would have had a better chance of acquittal had he been tried alone. See *Johnson* v. *United States, supra* at 368. Here, the Commonwealth introduced convincing evidence that at least one defendant, but not necessarily both of them, robbed and killed Wronski. The only realistic escape for either defendant was to blame the other.

Failure to sever in such circumstances has several unacceptable consequences. First, each codefendant's jeopardy invites his perjured testimony, to the detriment of the other codefendant. The Commonwealth's use of such testimony to obtain a conviction is fundamentally unfair and does not serve the public's interest in justice. Second, where there is convincing evidence that a crime has been committed by at least one of the defendants, a jury, disinclined for any reason to convict a particular defendant, may be inclined to find the other guilty. There is a danger that the jury will feel compelled to choose between defendants rather than to assess the proof against each defendant separately. Finally, with one defendant pitted against the other, there is a danger that the jury will unjustifiably infer from the conflicting defenses alone that both defendants are guilty. *Rhone* v. *United States,* 365 F.2d 980, 981 (D.C. Cir. 1966). Moran's and Chenail's defenses were mutually antagonistic and irreconcilable. The prejudice to each defendant was compelling. Tried together, neither defendant could have a fair trial. Severance was required.

The denial of a requested severance does not require reversal unless the request is made at a time when the necessity for severance has been firmly established. A premature request for severance, not renewed when the necessity to sever

has been established, is not sufficient. Here, it appeared likely from pretrial discussion that each defendant would attempt to escape conviction by blaming the other, and that the jury would hear the defendants' complete extrajudicial statements inculpating one another. In addition, the effect of Chenail's opening was a promise that Chenail's testimony would fully inculpate Moran. Finally, on cross-examination of the Commonwealth's witness, Officer Misiuk, Chenail's counsel elicited Chenail's entire extrajudicial statement placing responsibility on Moran for the beating of Wronski. Moran then renewed his motion for severance and moved for a mistrial. At least by this point, Moran's need for severance and mistrial was not a mere possibility suggested by counsel seeking the advantage of a separate trial. The trial had become unfair as to him. In these circumstances, denial of Moran's motions requires reversal, and new trials.[6]

Moran supported his severance motions by emphasizing that the irreconcilable differences between the defendants' extrajudicial statements, and between Chenail's extrajudicial statements and Moran's defense, violated his Sixth Amendment right to confront witnesses against him. Our decision is based on a rationale only suggested, but not developed, by Moran at the trial. Nevertheless, substantial justice requires reversal of his unarmed robbery conviction. See *Commonwealth* v. *Stokes,* 374 Mass. 583, 587-589 (1978); *Commonwealth* v. *Freeman,* 352 Mass. 556, 561-564 (1967); *Commonwealth* v. *Conroy,* 333 Mass. 751, 757 (1956).

Although Chenail filed a motion for severance before trial, he did not press it or renew it during trial, nor has he

---

[6] Severing the trial of codefendants does not necessarily require mistrial as to both defendants. Here, the trial judge should have granted Moran's motions for severance and mistrial. However, since Chenail did not timely move for severance, and never moved for mistrial, the judge should have continued Chenail's trial after granting Moran's motions. Indeed, the judge having granted Moran's motions, his failure to continue the trial of Chenail could have barred any retrial of Chenail on double jeopardy grounds. See *Jones* v. *Commonwealth,* 379 Mass. 607, 615-620 (1980).

argued it here. He seeks reversal of his unarmed robbery conviction on another ground. Nevertheless, at least by the time Moran's testimony, fully inculpating Chenail, was admitted in evidence, the trial had become unfair to Chenail. In the circumstances of this case, substantial justice requires reversal of Chenail's unarmed robbery conviction.

*Judgments reversed.*

*Verdicts set aside.*