COMMONWEALTH *vs.* CRAIG C., a juvenile.

No. 96-P-185.

Suffolk. November 5, 1997. - January 26, 1998.

Present: WARNER, C.J., DREBEN, & FLANNERY, JJ.

*Practice, Criminal,* Severance, Trial of defendants together. *Evidence,* Exculpatory, Cumulative evidence.

At the trial of two juveniles for murder in the first degree in which the defendant was convicted and the codefendant's case ended in a mistrial when the jury could not agree, the judge's refusal to sever the trials did not compromise the defendant's right to present his defense and the judge's redaction, to avoid prejudice to the codefendant, of certain portions of prior recorded testimony of unavailable witnesses was not error, where the excluded parts were cumulative of other properly admitted evidence. [213-216]

There was no merit to a criminal defendant's claim that his and the codefendant's theories of defense were so mutually antagonistic as to warrant severance of their trials. [216-217]

COMPLAINTS received and sworn to in the Boston Division of the Juvenile Court Department on May 24, 1993.

On appeal to the jury session of that division, pretrial motions for severance were heard by *Mark E. Lawton,* J., and the cases were tried before him.

*John F. Palmer* for the defendant.

*Kelly A. Downes,* Assistant District Attorney, for the Commonwealth.

WARNER, C.J. A Juvenile Court jury found the defendant delinquent by reason of first degree murder, armed assault with intent to murder, and unlawful possession of a firearm.[1] He was

---

[1]The defendant waived his right to a trial by jury in the first instance and was tried in the bench session of the Boston Juvenile Court on charges of first degree murder of Telley Coleman, armed assault with intent to murder Nekia Brown, armed assault with intent to murder Floyd Utley, and unlawful possession of a firearm. He and his codefendant were adjudicated delinquent by

tried with a codefendant, whose case ended in a mistrial because the jury were unable to reach a unanimous verdict.[2] The defendant argues that the judge erroneously denied his motions, made before and during trial, to sever his trial from that of his codefendant. As a result, he contends, the two were required to present mutually antagonistic defenses at a joint trial and the defendant was prevented from presenting exculpatory evidence.

Telley Coleman, a ninth grade Boston high school student, was shot to death inside the New England Medical Center subway station on Friday, May 21, 1993. The prosecution contended that the codefendant was the shooter, and that he had been aiming at another student, Nekia Brown, but missed and killed Coleman, who was standing next to Brown. The Commonwealth's theory was that the defendant, who had a grudge against Brown and had encouraged the codefendant to fire the fatal shots, was thus responsible for the murder as a joint venturer. See, e.g., *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). The defense maintained that while the defendant may have been present as a bystander, he did not encourage the shooter to fire his gun. The codefendant's strategy was to suggest that not he, but another student present at the time of the shooting, Wilbert Wallace, known as "Moosie," was the shooter.

A summary of the complicated evidence in this case, as presented by the Commonwealth and the defendant, is, perforce, detailed as follows. Further details will be added where necessary.

. *The Commonwealth's case.* Some time during May, 1993, Brown had beaten the defendant, a ninth grader at Boston high school, because the defendant had previously abandoned Brown's cousin, Floyd Utley, while a group of youths was attacking Utley. The day before the shooting, the defendant had another confrontation with Brown. The defendant had asked some friends, including Menthu Wallace (Wallace) and Edward Harris, to accompany him to the subway station to "watch his

reason of three of the charges and were acquitted of armed assault with intent to murder Floyd Utley.

The defendant claimed an appeal to a de novo jury trial in the Boston Juvenile Court. After the jury convicted him of first degree murder, the trial judge allowed his motion, assented to by the Commonwealth, to reduce the conviction to second degree murder.

[2]The codefendant subsequently pleaded guilty to second degree murder.

back" while he fought with someone from Boston high school. As a group of Boston high school students, including Brown and Utley, were following their usual route home along Tremont Street, past the Church of All Nations, and toward the New England Medical Center subway station, the defendant and his friends approached Brown and Utley. The boys spoke, and both groups walked into the station. Inside, Brown asked the defendant whether he had been looking for him and Utley. Brown pulled out a knife, and said he hoped not, because someone would be "getting stabbed" that day.[3] The defendant turned and walked away, indicating that Brown should follow him out of the station. Brown did so, as did approximately ten other students. Once outside, according to one of the students, the defendant said to Brown, "I know you don't want none of this," and lifted up his shirt, displaying a gun handle. Witnesses offered conflicting testimony concerning the gun. Some asserted that they saw the defendant withdraw a gun, while others maintained that they did not see him with a gun at all. At this point, the youths dispersed. Later that evening, the defendant telephoned his classmate Nia Rice, and told her that he had come to school "strapped" that day, meaning that he had a gun.

The next afternoon, the day of the shooting, the defendant told Shira Shields, another classmate, that he was tired of Brown and Utley because they had fought, that he planned to go to the school and shoot them, and that he had a gun in his house. When school recessed that day at about four-fifteen, most of the ninth grade Boston high school students headed for the subway station as usual. Among the girls were LaDawn Baker, Rice, and Shields. Azure Parker had gone to the school late in the day to speak to one of her friends, bringing her six-month-old daughter. She then joined the other students walking toward the subway. The boys in this group included Brown, Utley, Coleman, JahJah Rudder, and Ronnie Furtado. The group encountered the defendant and five to ten of his friends, including Wallace, Moosie, Harris, and the codefendant, on the sidewalk across the street from the subway station. The defendant and his friends lifted up their shirts, signalling that they carried guns, and said, "What's up?" Baker, Utley, Brown, Coleman, and the rest of their group continued walking. According to Brown, Coleman was then a couple of feet in front of him.

---

[3]At trial, Brown denied that he had shown the defendant a knife.

Parker saw the defendant walking toward the middle of the street as she approached the Church of All Nations and asked him not to shoot because she had her daughter with her. He did not reply. Rice saw the defendant with five or six of his friends on the street corner near the Quincy School, which is located across the street from the subway station. She called to him, and he crossed the street alone to speak with her. She told him not to start any trouble, and he told her not to worry. At that point, Rice heard someone say "What's up, what's up" and saw that person throw his hands in the air. This boy, who had been with the defendant, wore a black hooded jacket with a yellow symbol above the pocket. He stood in front of the Oak Street entrance to the subway station, facing the group of boys who had been walking with Rice. The boys in Rice's group began saying "What's up" in response, and the boy in the hooded jacket pulled out a gun.

Brown, Utley, Coleman, Rudder, and Furtado, along with other students, then ran toward the subway station entrance located on Tremont Street and down the stairs into the station. The boy with the gun ran down the stairs of the Oak Street entrance. Parker, Rice, and Baker saw the defendant run toward the Oak Street entrance and heard him say, "Shoot the fat one." Furtado saw the defendant at the top of the stairs leading into the station.[4] Within seconds, gunshots rang out. The shooter then ran out the Oak Street entrance. Parker and Baker saw the defendant run out with him.[5] Coleman had been shot and was slumped over, bleeding, inside the station.

The police soon arrived, and a police officer drove Baker, Shields, and two other girls around the area to search for the defendant and the shooter. The girls spotted the defendant and another boy sitting on a bench outside an apartment courtyard. The other boy, later identified as Moosie, wore the same sneak-

[4]A bystander testified that he did not see anyone run into the subway station with the shooter or hear anyone shout anything to the shooter.

[5]Another witness, Kalymba Clark, who had been with a group of students walking to the subway, testified that she saw the defendant and the gunman run into the Tremont Street entrance (not the Oak Street entrance, as the other witnesses testified), that she heard the defendant say something like "fire the gun," but could not be precise because of the traffic noise, and that after the shooting she saw the defendant running along the street with the gunman. She further stated that she had made her observations from across the street, could not see well at distances, and was not wearing her glasses the day of the shooting.

ers and pants as the shooter. Shields screamed at the defendant, "You shot Telley."

*The defendant's case.* The defendant presented the direct testimony of one witness, Rudder, and the prior testimony of another, Harris, both of whom asserted that they did not see the defendant follow the shooter to the subway station and did not hear him tell the gunman to shoot. He also presented Wallace's prior statement to the police asserting that he remained standing with the defendant across the street from the station when the shooting occurred. The trial judge ordered references to the codefendant redacted from the prior statements of Wallace and Harris, who both refused to testify at trial, in order to protect the codefendant's right to confront witnesses against him. See *Bruton* v. *United States*, 391 U.S. 123 (1968). The defendant argued that the statements were incomplete without reference to the codefendant, and that the redactions prevented him from presenting a complete defense.

*Severance.* (a) *Exculpatory evidence.* On appeal, the defendant contends that the redactions made to Wallace's and Harris's statements prevented him from presenting exculpatory evidence. He argues that the excisions "stripped" the statements of their context and significance because descriptions of the codefendant's actions were needed to support the defendant's position that, at the time the gunman ran into the subway station, the defendant was merely standing across the street as a bystander. Thus, he contends, the judge should have granted his severance motion.

In a joint trial, a judge may limit the scope of admissible evidence to avoid needless prejudice to a codefendant so long as he gives "adequate consideration to the defendant's right to a fair trial." *Commonwealth* v. *Smith*, 418 Mass. 120, 127 (1994). To demonstrate that a judge has abused his discretion by refusing to sever the trial of codefendants, a defendant must make the "essentially fact-based" showing that the ruling deprived him of exculpatory evidence or evidence that would have substantially strengthened his case. *Id.* at 126-127. We discuss the relevant evidence as follows.

(1) *Wallace's statement to the police.* Wallace had testified at the defendant's bench trial, and portions of that testimony were read in evidence in the Commonwealth's case. In that testimony, Wallace asserted that he had seen the codefendant run across the street toward the subway station and down the stairs, and

that he heard gunshots about thirty seconds later. However, he could not remember what the defendant was doing at that point or whether anyone else had crossed the plaza with the codefendant.

The defendant sought to impeach Wallace's assertion that he could not remember where the defendant was at the time of the shooting by presenting an interview Wallace had had with the police on May 24, 1993, in which he stated that the defendant had remained across the street from the subway station while the codefendant ran across the street and into the station, where the shots were fired.

Although the portion of Wallace's interview to be read to the jury was supposed to omit all references to the codefendant, Boston police Detective Thomas Traynor inadvertently read in evidence a portion of the statement which placed the defendant across the street from the station at the same time the codefendant ran to the station and Coleman was shot.[6] Counsel for the codefendant objected to the reference to his client, but the trial judge did not issue a limiting instruction.

---

[6]Detective Traynor's testimony included the following portion of Wallace's statement to the police.

TRAYNOR: "And where were you at the time they were saying 'What's up?' "

WALLACE: "I was with [the codefendant, the defendant, Edward Harris and Wilbert Wallace, or 'Moosie']."

. . .

TRAYNOR: "Where were you guys standing at the time?"

WALLACE: "Across the street from the New England Medical Center."

TRAYNOR: "Across the street from the station?"

WALLACE: "Yes."

TRAYNOR: "And where were the other kids that you were waiting on at this time?"

. . .

WALLACE: "Near the [Church of All Nations]."

TRAYNOR: "And then what happened from there?"

WALLACE: "They put their hands up in the air and then some — and then so everyone just put it back. And then they just kept on walking. Then they crossed the street, and then they told us to come down to the station. And then [the codefendant] did."

TRAYNOR: "And where were the rest of you guys?"

WALLACE: "Across the street."

TRAYNOR: "You all were still standing across the street?"

WALLACE: "Yes."

(2) *Edward Harris's grand jury testimony.* In pertinent part, the jury heard that the defendant had asked Harris and other boys to accompany him to Boston high school the day of the shooting where the defendant was going to "fight with the dude up and up." As the defendant, Harris, and other boys stood across the street from the subway station another group of boys came by and the defendant began to argue with them. At the time, the defendant was on the sidewalk in the middle of Tremont Street. Harris did not see the defendant go down to the subway station after he heard gunshots.

Excised from Harris's testimony was his assertion that the codefendant ran into the station while the defendant remained standing in the middle of the street.[7] Also redacted from Harris's testimony was his assertion that the codefendant was the only one who had gone into the station after the group of boys.

Despite the redactions, the defendant was able to convey adequately to the jury evidence to support his position that he remained across the street from the station when the shooting occurred. This included the testimony of Rudder, the victim's friend who accompanied him into the subway station, that Rudder saw the defendant standing across the street from the station, did not see him cross the street prior to the shooting, and did not hear anyone shout "shoot." The jury also heard Detective Traynor read into evidence, albeit inadvertently, Wallace's statement that he saw the defendant standing across the street from the subway station at the same time the codefendant entered the station. The jury further heard that Harris did not see the defendant go into the station.

---

[7]This portion of Harris's testimony is as follows. The redactions are italicized.

Q. *"When [the codefendant] ran towards the train station, where were you standing?"*

A. *"Across the street like next to this bench. I was like standing next to the bench."*

Q. *"And where was Wilbert Wallace?"*

A. *"Next to the bench. They was all next to me."*

Q. "And where was [the defendant]?"

A. "Like in the middle of the street. Like on Tremont."

Q. "He was in the middle of the street. About how far ahead of you was he?"

A. "Like — I'd say, he was like Mass. Pike is right there, and he was like on the sidewalk, like in the middle of the street right there."

While the admission of Harris's entire statement would have emphasized further the defendant's contention that he did not follow the gunman to the subway station, the defendant was able to present that evidence by other means. The judge's refusal to sever the trials did not compromise the defendant's right to present his defense. See *Commonwealth* v. *Smith*, 418 Mass. at 127-129, and cases cited; *Commonwealth* v. *Twing*, 39 Mass. App. Ct. 75, 78-79 (1995). See also *Commonwealth* v. *Rawlins*, 352 Mass. 293, 295 (1967) (the exclusion of cumulative evidence is rarely prejudicial error); *Commonwealth* v. *Young*, 35 Mass. App. Ct. 427, 442-443 (1993) (exclusion of evidence of the victim's threatening remarks was not prejudicial since the evidence was cumulative of evidence already before the jury).

(b) *Antagonistic defenses.* The defendant argues that his and the codefendant's theories of defense were mutually antagonistic, and that this situation also warranted severance. Theories of defense are mutually antagonistic and irreconcileable when "the only realistic escape for either defendant [is] to blame the other." *Commonwealth* v. *Moran*, 387 Mass. 644, 659 (1982). Severance is required only where the "prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth* v. *Twing*, 39 Mass. App. Ct. at 78, quoting from *Commonwealth* v. *Cunningham*, 405 Mass. 646, 654 (1989).

No such prejudice exists here. The defendant's and codefendant's theories were not mutually antagonistic. The defendant's strategy was to show that he was merely a bystander to the shooting. The codefendant's theory was that another person who had been at the scene, Moosie, was the shooter. Although there was some association between Moosie and the defendant — when the defendant was arrested, he was sitting on a bench with Moosie — there was no conflict between the two theories of defense. The jury could have believed that Moosie, not the codefendant, was the shooter and at the same time could have found that the defendant was merely a bystander. "[T]he jury [would not have felt] compelled to choose between defendants rather than to assess the proof against each defendant separately." *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 853 (1988), quoting from *Commonwealth* v. *Moran*, 387 Mass. at 659.

"A defendant is not entitled to severance because he may wish to use a different trial strategy than his codefendant, or even if he 'would have had a better chance of acquittal had he

been tried alone.' " *Commonwealth* v. *Smith*, 418 Mass. at 129, quoting from *Commonwealth* v. *Moran*, 387 Mass. at 659. The defendant has not demonstrated that the judge abused his discretion in refusing to sever.

*Judgments affirmed.*