COMMONWEALTH *vs.* JOHN FORTES, JR.

No. 96-P-1723.

Bristol. September 10, 1998. - July 2, 1999.

Present: ARMSTRONG, DREBEN, & JACOBS, JJ.

*Robbery. Homicide. Practice, Criminal,* Instructions to jury. *Assault and Battery. Wanton or Reckless Conduct.*

An unarmed robbery (a purse snatch) of an elderly person is an event that a reasonably prudent person would apprehend as posing a high degree of likelihood that substantial harm will result to the victim. [215-216]

At the trial of indictments for unarmed robbery and involuntary manslaughter, the death of the victim having resulted from injuries received in the robbery, error, if any, in the judge's instructing the jury on the theory of the battery-causing-death (as well as the theory of wanton and reckless conduct causing death) was harmless, where the same standard of proof was applicable to both types of manslaughter, and the fact that the battery was in aid of a felony rather than a misdemeanor was immaterial. [216-220]

INDICTMENT found and returned in the Superior Court Department on April 9, 1992.

The case was tried before *Stephen E. Neel*, J.

*Benjamin H. Keehn*, Committee for Public Counsel Services, for the defendant.

*M. Catherine Huddleson*, Special Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. Early one evening in February, 1992, the defendant and a companion, Westgate, were out walking in New Bedford "seeing what [they] could get into." They saw a sixty-five year old woman, Lucille Labens, bringing out her household trash and decided to steal her purse, which hung by a strap from her left arm. Westgate walked up behind Mrs. Labens, grabbed the purse strap, and attempted to slide it off her

arm.[1] Mrs. Labens caught the strap in her hand and a brief struggle ensued, during which Westgate pushed or pulled her to the pavement, seriously injuring her knee. She continued to hold on, and he freed the purse only after pulling her along the ground.[2] Mrs. Labens underwent surgery the next day to repair her dislocated kneecap. Blood clots developed as a complication of the surgery, which led to her death by coronary embolism six days after the purse snatching. The defendant, charged with unarmed robbery of a person age sixty-five years or older and involuntary manslaughter, was tried as a joint venturer and convicted on both charges.

The defendant does not appeal from his conviction of unarmed robbery. As to the involuntary manslaughter conviction, the defendant makes two arguments: (1) that the Commonwealth's proof was insufficient as to one element of the crime, namely that the purse snatching "was undertaken with knowledge of facts that would cause a reasonable person to know that a danger of serious harm existed," *Commonwealth* v. *Sires*, 413 Mass. 292, 302 (1992); and (2) that the manslaughter indictment was submitted to the jury on two theories of liability, one of which was inapplicable to the evidence, so that, because it is impossible to know on which theory the jury acted in reaching its general verdict, the conviction cannot stand. See *Commonwealth* v. *Plunkett*, 422 Mass. 634, 635 (1996), and cases cited.

1. We reject the first argument, which is predicated on a statement in *Commonwealth* v. *Moran*, 387 Mass. 644, 651 (1982), that "[u]narmed robbery is not inherently dangerous to human life. Purse snatching can be robbery, see *Commonwealth* v. *Jones*, 362 Mass. 83, 89 (1972), but it need not be dangerous to life." The *Moran* case concerned felony-murder. The point being made was that a robbery, if the perpetrator is unarmed, does not by its nature pose a substantial risk to life; so that, in order to sustain a charge of felony-murder, the Commonwealth would have to prove that special circumstances of which the perpetrator knew or should have known did in fact pose a serious risk to life that the perpetrator chose to disregard. *Ibid.* This case involves not felony-murder, but involuntary manslaughter,

---

[1]The defendant suggested the snatch, and Westgate agreed to do the act when the defendant promised to do the next one.

[2]The defendant and Westgate then fled, went to the defendant's residence, divided up the cash, and threw the purse into a dumpster.

which only requires "a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990), quoting from *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). *Commonwealth* v. *Sires*, 413 Mass. at 304 n.14. That test was met. Any robbery from the person, with the possible exception of pickpocketing, involves a substantial likelihood that the victim will resist and that a struggle may ensue. Where the victim is elderly, years removed from the rough and tumble of the playground and contact sports, and with the impaired resilience of bone and sureness of balance that age entails, any resistance will lead predictably to falls and a high likelihood of injury.[3] This is a matter of common experience, that any fall of an elderly person — particularly a rough fall on a hard surface, as here — is a source of serious concern, as are the anxiety of the occasion and the exertion of resistance, which pose dangers to the elderly that might not be expected in younger victims. A robber who subjects an elderly victim to a highly predictable risk of serious injury cannot escape responsibility merely because he hoped that the victim would docilely yield up a purse or wallet without resisting. It is immaterial that the defendant and Westgate might not have anticipated the danger. The legal test is the danger that a reasonably prudent person would apprehend. See *Commonwealth* v. *Reed*, 427 Mass. 100, 104, 106 (1998). Compare *Commonwealth* v. *Jenner*, 24 Mass. App. Ct. 763, 773-774 (1987) (victim's flight, and injuries therefrom, foreseeable), citing *Commonwealth* v. *Bianco*, 388 Mass. 358, 362-363 (1983), and *id.* at 374-375 (Liacos, J., dissenting).

2. Picking up on a suggestion made in the Commonwealth's

---

[3]There was ample evidence from which the jury could properly infer that, before Westgate actually knocked the victim down, the joint venturers must have been aware that the victim was an elderly person. First, the incident began when they observed Mrs. Labens from across the street and discussed which one would grab the purse. Second, although Westgate approached her from behind, it is a matter of common experience that one can get a sense of a person's age even from such a vantage point — particularly here, where Westgate walked rather than ran up behind her, giving him ample time to observe her, and where he came up directly adjacent to her, within arm's reach. Third, the jury could infer that, in his initial struggle with her and before he knocked her down, Westgate observed the victim and knew she was an older person, yet chose to disregard that fact in his pursuit of her property. (There was testimony from a good Samaritan who happened by after the incident that the victim was elderly in appearance. A photograph of the victim was also put in evidence.)

brief, the defendant in his reply brief makes an argument not raised earlier either in this court or below: namely, that the judge, who instructed the jury on both the wanton and reckless aspect of involuntary manslaughter and on the battery-causing-death aspect of that crime, see *Commonwealth* v. *Catalina*, 407 Mass. at 789, erred because the battery-causing-death aspect of involuntary manslaughter is inapplicable where the battery occurs, as it did here, in the commission of a felony (i.e., unarmed robbery).

The defendant's argument is predicated on decisions since *Catalina* that both parties read as having held that the non-felonious character of the defendant's underlying crime is, in effect, an element of battery-manslaughter.[4] On its face the defendant's contention seems counterintuitive: that he can, in effect, defend against manslaughter liability for the unexpected death of Lucille Labens on the basis that his crime against her was felonious rather than merely unlawful.

Under the law prior to *Commonwealth* v. *Matchett*, 386 Mass. 492 (1982), and *Commonwealth* v. *Catalina, supra*, the general rule was that an unintended death caused by the commission of a crime malum in se was murder if the crime was a felony and manslaughter if the crime was a misdemeanor only.[5] See *Commonwealth* v. *Campbell*, 352 Mass. 387, 397-399 (1967) (headlock that strangled victim, if done with intent simply to quiet her down, was a simple battery, and the death manslaughter; but if done with intent to rape her, was felonious, and the death was murder). The *Matchett* decision narrowed the application of felony-murder by requiring the Commonwealth to prove that the felony that caused the unexpected death was by its nature one that threatened grievous injury — armed robbery, for example — or, alternatively, that the manner of its commission showed a "conscious disregard of the risk to human life." 386 Mass. at 507-508. The *Catalina* decision narrowed the applica-

---

[4]The cases cited are *Commonwealth* v. *Sires*, 413 Mass. at 302 n.10; *Commonwealth* v. *Donovan*, 422 Mass. 349, 353 (1996); and *Commonwealth* v. *Reed*, 427 Mass. at 104.

[5]The rule was applied with limitations. "We [i.e., the Supreme Judicial Court] require, for example, that a homicide committed in the course of a felony or attempted felony, be the natural and probable consequence of the act. See *Commonwealth* v. *Devlin*, 335 Mass. 555, [567] (1957)." *Commonwealth* v. *Matchett*, 386 Mass. at 504-505. "The vast majority of felony-murder convictions in this Commonwealth rest on the inherently dangerous common law felonies of arson, rape, burglary, and robbery." *Id.* at 505 n.15.

tion of unlawful act-manslaughter to deaths that occur as a result of (1) a battery that (2) "is done with such violence that [physical] harm [is] likely to result." 407 Mass. at 784 n.6, 789, incorporating by reference the judge's charge to the jury in *Commonwealth* v. *Sheppard*, 404 Mass. 774, 777 (1989). After *Matchett* and *Catalina*, therefore, felony-murder and battery-manslaughter could be differentiated according to the inherent danger posed by the defendant's conduct. The danger necessary for battery-manslaughter, restated in *Commonwealth* v. *Sneed*, 413 Mass. 387, 394 (1992), as "a high degree of likelihood that substantial harm will result to another" (quoting from *Commonwealth* v. *Welansky*, 316 Mass. at 399), "expresses a level of risk of physical harm below those levels that must be shown for a conviction of murder in the first degree (a) on the theory of felony-murder (*Commonwealth* v. *Matchett*, [*supra* at 508]) ('conscious disregard of the risk to human life') and (b) on the basis of third-prong malice (*Commonwealth* v. *Sires*, [*supra* at 303]) ('plain and strong likelihood that death would follow the act')."

If, as appears to be true, the perceptible degree of danger posed by the defendant's conduct marks the dividing line between murder liability and manslaughter liability for unintended deaths occurring in the commission of another underlying crime, the earlier felony-misdemeanor dividing line no longer serves a purpose if it refers to the legal status of the underlying crime. Indeed, its retention would create a legal no man's land in a case such as this where the underlying crime — unarmed robbery — is a felony but the defendant's conduct poses a foreseeable risk of physical injury only, not death; and a factor — the felonious nature of the defendant's conviction — that operated under the earlier law as one of aggravation would become one of exoneration from any legal responsibility for the death.

The cases since the *Matchett* and *Catalina* decisions that have referred to felonious and non-felonious batteries[6] have all done so, not in relation to an underlying crime, but in relation to the battery itself. Batteries by the use of a gun or a knife have typically been classified as felonious batteries, while those involving punches or other weaponless violence are non-

---

[6]Examples include, in addition to the *Sires*, *Donovan*, and *Reed* cases cited in note 4, *supra*, *Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994); *Commonwealth* v. *Nichypor*, 419 Mass. 209, 217 (1994).

felonious batteries, subject to the qualification that, if carried on with such violence that the threat to life is obvious, even a simple battery can be a basis for murder. Under this interpretation of the cases, there is no reason why the law should not treat as manslaughter an unintended death caused during the commission of a felony by a non-felonious battery, at least in the range of felonies that are not deemed inherently hazardous to life. Contrast armed robbery and armed assault, see *Commonwealth* v. *Tevenal*, 401 Mass. 225, 230 (1987); *Commonwealth* v. *Padgett*, 44 Mass. App. Ct. 359, 367 (1998).

If this reading of the post-*Catalina* decision is incorrect, and it was error to charge the jury on battery-manslaughter, nevertheless any error was harmless. Under *Commonwealth* v. *Catalina*, involuntary manslaughter has two aspects: a battery aspect, and a wanton, reckless behavior aspect. The battery aspect requires the Commonwealth to prove that the battery was done "with such violence that [physical] harm is likely to result [to the victim]." *Commonwealth* v. *Sheppard*, 404 Mass. at 777, discussed in *Catalina, supra* at 784 nn. 5 & 6. That degree of culpability was differentiated, at least verbally, from the degree of culpability required for the wanton and reckless aspect of involuntary manslaughter, see *id.* at 784 n.5, which was stated, in the words of *Commonwealth* v. *Welansky*, 316 Mass. at 399, as "a high degree of likelihood that substantial harm will result to another." See *Catalina, supra* at 789. Any differentiation disappeared with the subsequent decision in *Commonwealth* v. *Sneed*, 413 Mass. at 394, which amended the formulation of *Catalina* and *Sheppard*, see *Sneed, supra* at 394 n.5, such that, henceforth, the *Welansky* test of culpability would apply as well under the battery aspect of involuntary manslaughter. "Thus the same standard of proof is applicable to both types of involuntary manslaughter . . . ." *Sneed, supra* at 394. See note 3, *supra*. In a charge more favorable to the defendant than was required, the judge in this case instructed the jury that a battery, for purposes of involuntary manslaughter, "occurs when the [perpetrator] is aware or should be aware that the battery he is committing endangers human life." Thus, even if the jury conceived of its verdict as battery-manslaughter, it necessarily found the elements of wanton, reckless manslaughter.[7] Under the wanton, reckless aspect of involuntary manslaughter, the fact that the

---

[7]The term "wanton or reckless conduct" is broadly defined in the leading case, *Commonwealth* v. *Welansky*, 316 Mass. at 399, as "intentional conduct,

battery was in aid of a felony rather than a misdemeanor is immaterial.

*Judgments affirmed.*

---

by way either of commission or [of] omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." The conduct is defined, in other words, solely by its great propensity to cause substantial physical harm to another, and may include a battery such as the one before us. The word "intentional" refers to the act that causes the harm, not the harm itself. *Id.* at 398.