Feeley, TimothyQ., J.
Defendants Daniel Lee Lopez, Jr. (“Lopez”) and Ronny Ramos (“Ramos,” and collectively with Lopez, the “defendants”) are charged with first-degree murder and unarmed robbery. The “felony murder rule” is the basis for the first-degree murder indictments. Unarmed robbery is the underlying felony charge. Lopez is charged as the principal, while Ramos is charged as a joint venturer/aider and abettor. The robbery victim, Thu Nguyen (“Nguyen” or the “victim”) was delivering Chinese food for a local restaurant at the time of the events. It is alleged that Lopez orchestrated the robbery by ordering Chinese food to be delivered to a certain address in the Stadium Projects in Lawrence (the “projects”), with an intention of robbing the delivery person of money and/or the ordered food. It is further alleged that upon Nguyen’s arrival at the provided address, Lopez struck him in the face, causing him to fall backwards and strike his head on the concrete sidewalk. It is further alleged that Lopez, with Ramos’s assistance, then robbed Nguyen as he laid on the sidewalk, and ran off, along with Ramos, and with money and food taken from Nguyen. Nguyen died the following day from injuries received when his head struck the sidewalk.
The defendants now move to dismiss the first-degree murder indictments against them on the basis of Commonwealth v. McCarthy, 385 Mass. 160 (1982), arguing that insufficient evidence was submitted to the grand jury to support the indictments for felony murder returned by the grand juiy.[1] The defendants focus on the requirement, in a felony murder case charged based on unarmed robbery, that the robbery must have been committed with conscious disregard for the risk to human life. See e.g., Commonwealth v. Moran, 387 Mass. 644, 651 (1982). As discussed below, the issue before this court, on defendants’ McCarthy motions, is whether the grand jury heard sufficient evidence to support a finding of probable cause to arrest the defendants for first degree/felony murder. For reasons discussed below, the defendants’ motions to dismiss are ALLOWED, without prejudice to further action of the grand jury not inconsistent with this memorandum.

BACKGROUND

As the issue in this McCarthy motion focuses on the evidence heard by the grand jury, the facts contained herein are taken from the transcripts of the various witnesses called before the grand jury. It is worth noting at the outset that despite the presence of a large number of young people at the crime scene the Commonwealth, through no fault of its own, had difficulty finding witnesses who could, or were willing to, acknowledge personal observations of the events in question.
At about 10:00 p.m. on July 30, 2009, the Evergreen Restaurant, a Chinese restaurant that delivers take-out food orders, received an order for two combination plates, to be delivered to 230 Osgood Street in the projects. The caller was a young male with a Spanish accent. A female could be heard giggling in the background. The restaurant employed Nguyen to *545 deliver take-out orders, both on foot and by car. Nguyen was given the order for 230 Osgood Street to deliver. The resident of that address was interviewed and she told police that she did not place any order for food that night.
Evelyn Croché (“Croché”) is a young woman who lived at 226 Osgood Street at the time of the events in question. That night, she was in her second-floor bedroom and looked out her window to see a group of about ten kids, a few with bats, walking toward the corner of Osgood Street, and yelling their gang name, SP, which stands for Stadium Projects. The group went to the comer and gathered on the sidewalk. Croché recognized no one at first. She then recognized two young girls who lived behind her, and later recognized Lopez (known to her as “Bebe”). Croché left her window but returned later and saw a man lying on the “floor,” which apparently means the “ground.” The man was on the sidewalk in front of 230 Osgood Street, on his back, with his feet pointed toward the stairs and his head pointed toward the street. She saw the youths who had been on the comer run across the street. She also observed Lopez going through the man’s pants pocket. Lopez was kneeling as he went through the man’s pants pocket, with a second man standing in front of the man, at the man’s head, facing 230 Osgood Street. She could observe no conversation between Lopez and the second man, who she did not recognize, but described as Hispanic, short hair, skinny, and about five feet, six inches tall. When Lopez finished rifling the victim’s pocket, he and the second man took off running across the street in the same direction as the other youths. She observed nothing in the hands of either man. Croché saw Lopez the following morning and they discussed the events of the previous night. Croché said that Lopez told her that “he was hungry and he wanted some liquor and that — that he went to rob him and he took the money.” Lopez admitted to Croché that he punched the man, ate the Chinese food, and went to the liquor store with the money he took, which he claimed to have been $125.
On the night of July 30, 2009, Robin Munroe, Director of Security for Lawrence Housing Authority, was responding to a call about a large birthday party on West Dalton Street, which is in the projects, just behind 230 Osgood Street. As he turned from Osgood Street onto West Dalton, two young girls pointed out to him a man lying on his back on the sidewalk in front of 230 Osgood Street. Munroe investigated and found that the man (Nguyen) was unconscious, but breathing. Munroe called the police and an ambulance; both arrived within five minutes of his request.
Wainer Caba (“Caba”) was seventeen on the night in question. He was “chilling” in the projects earlier in the evening of July 30, 2009. He was in the Osgood Street area upon reports that a birthday party was being held at a nearby residence. He learned that the party was cancelled and spent some time on the comer of Osgood Street with a group of young people he estimated to be about twenty-five in number. He recognized a number of the gathered youths, but by no means most. Among the four or five he mentioned, Ramos was one, who he knew as Ronny Dukes. While still at the corner of Osgood Street, Caba saw Lopez arrive by himself in a taxi. Lopez gave “daps” (apparently like a high-five or fist bump) to those who were there, including Ramos and Caba, then walked into the projects. Shortly thereafter, Caba saw Lopez return alone from the direction he had headed, and Lopez said “I’m abouts to go do me,” meaning, to Caba, “I’m about to do something.” Caba then left the corner of Osgood Street. Caba never saw Lopez with anyone. About fifteen minutes later, Caba, then in a different location, saw a group of people running toward him. Lopez was among the group and told Caba: “Yo, be dip,” “run.” Caba saw a brown bag in Lopez’s hands, that he described as being like a delivery bag. Caba also saw Ramos in the group, who he recognized as the only black person among the group. Later that night, Caba went to a birthday party in the projects where he saw Ramos. He never saw Lopez again that night.
Jimmy Guerrero (“Guerrero”) was also seventeen on the night in question. He attended a party in the projects until it was broken up by police. He ended up at the corner of Osgood Street with about fifteen other youths. He observed “some Chinese guy” pull up, “coming to bring the food, and he just gets hit by some guy . . . and then when he falls on the floor like everybody just like scattered.” Guerrero testified that the Chinese guy was on the bottom of the stairs when he was struck and the man who struck him was on the top of the staircase. He knew the man who struck the delivery man to be Lopez, known to him by his street name, Bebe. Guerrero saw two or three others with Lopez on the stairs, but on the other side of the railing. Guerrero did not see Ramos at the stairs or in the group of young people. Guerrero left the projects in a vehicle with several of his friends, including one (Jomar) who had let Lopez use his cell phone.
Charlene Rios (“Rios”) was sixteen on the night in question. She was at the party in the projects with Guerrero and others until it was broken up by police. Upon leaving the party with a girlfriend, she heard a thump, saw a “guy on the floor and, then, two kids running.” She knew one of the two “kids” as Ramos, and recalled that he had Chinese food in his hands. Rios had seen the other “kid” before, but never with Ramos. Rios left the area in the vehicle with Guerrero and others. She recalled that Jomar said someone had used his cell phone to call for the Chinese food.
Victor Regalado (“Regalado”) was seventeen on the night in question and was at the party with Guerrero and Rios in the projects until it was broken-up. He saw Ramos at the party. He later saw Jomar hand his cell phone to a person, but did not know the person, and *546 could not identify him. At the corner of Osgood Street, Regalado saw “the guy on the floor.” The guy was “just laying on his back ... I heard him gasping for air or something, and I just seen [Ramos] was, like, right next to him, like on the sidewalk." Ramos was “next to the guy who was falling, but he was, like, off the sidewalk,” two or three feet away from the guy, “just standing there.” Regalado saw another guy,.right next to the guy on the ground, “coming up from a crouched position and he just ran towards, like, a separate direction.” The second guy and Ramos ran off, splitting up, in slightly separate directions. He remembers Ramos or the other guy picking up the Chinese food and running off with it, but could not recall who between the two did so. Regalado’s recollection of conversation in the vehicle with Guerrero, Rios, and Jomar included a statement: “So it was Bebe,” Lopez’s street name.
Julia Elswick (“Elswick”) lives in Manchester, New Hampshire, and she knows Lopez through Lopez’s father. Shortly after July 30, 2009, and at the father’s request, Elswick permitted Lopez to stay at her house for a couple of days. During that time, she asked him why he was at her house. Lopez responded: “I messed up . . . the cops are looking for me because I hit a guy and stole Chinese food.”[2] In response to a question about whether he saw the man after he hit him and he (the victim) fell, Lopez told her that he “saw that foam was coming out of his mouth.” In response to a question as to whether he was acting alone, Elswick testified: “he did tell me there was other people. But he didn’t tell me names. Who, female, male, nothing . . . and also he told me pretty much it wasn’t his idea to do it, it was somebody else’s, but he went along with it.” She summarized Lopez’s statements to her in response to a later question from a grand juror as follows: “That he screwed up. And the cops were looking for him. And his friends and him called a Chinese restaurant and it turned into — he didn’t say steal, he didn’t say buy, but he said to get Chinese food. And he hit the guy once, the guy fell and he saw foam and he left.” Elswick did not know who Lopez’s friends were.
Finally, the grand jury heard from Massachusetts State Police Trooper Robert Labarge (“Labarge”). He first learned about the events in question the following day, on Friday, July 31st. Labarge told the grand jury that at first it was thought that the victim was going to survive, and then later it was learned that the victim was in critical condition and might not make it. Nguyen was pronounced dead at 1:30 p.m., July 31st. The cause of death was blunt trauma to the head. Labarge spoke to Ramos shortly thereafter.[3] Ramos stated that he observed the Chinese delivery man on the sidewalk, but did not know what happened. In looking at Ramos’s cell phone, Labarge observed the name “Beb” in the contacts list. He also testified that Croché identified a photo of Lopez as the “Beb” she knew and saw on the night of July 30th and the morning of July 31st. By checking the phone records of the Chinese restaurant, Labarge was able to determine that someone using “Jomar’s” cell phone called the restaurant just after 10:00 p.m. When interviewed, Jomar said he had given his phone to somebody he did not know and he did not know what that person did with the phone.

DISCUSSION

1. McCarthy Motion Legal Principles
The general rule is that a court should not inquire into the competency or sufficiency of evidence upon which an indictment is based. Commonwealth v. Clemmey, 447 Mass. 121, 130 (2006). However, the Supreme Judicial Court carved out a narrow exception to the general rule in McCarthy, 385 Mass. at 163, in which it held that the grand jury must have heard “sufficient evidence to establish the identity of the accused . . . and probable cause to arrest [him]” for the indictment to withstand a motion to dismiss. Accordingly, “the propriety of any indictment is limited to determining whether the grand jury received sufficient evidence to find probable cause for arrest.” Commonwealth v. Brzezinski, 405 Mass. 401, 402 (1989), quoting Commonwealth v. McGahee, 393 Mass. 743, 746-47 (1985). See also Commonwealth v. O’Dell 392 Mass. 445, 451 (1984) (evidence before a grand juiy is legally sufficient if it meets the probable cause arrest standard). In O’Dell the Supreme Judicial Court specifically refused to replace the probable cause standard with a requirement of sufficient evidence to warrant a guilty finding, even while recognizing probable cause to be the less stringent of the two standards. O’Dell 392 Mass. at 451. See K.B. Smith, Criminal Practice and Procedure §104 (1983) (“Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction”).
“[PJrobable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense.” Commonwealth v. Storey, 378 Mass. 312, 321 (1979). The test is an objective one. “The officers must have entertained rationally ‘more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt.’ ” Commonwealth v. Rivera, 27 Mass.App.Ct. 41, 45 (1989) quoting Commonwealth v. Bond, 375 Mass. 201, 210 (1978). Due consideration should also be given to the reasonable inferences that could be drawn by the officers. See Commonwealth v. Hill, 49 Mass.App.Ct. 58, 64 (2000), quoting Commonwealth v. Welch, 420 Mass. 646, 650 (1995) (“[Reasonable inferences and common knowledge are appropriate considerations for determining probable cause”).
*547 2. Felony-Murder Rule Legal Principles
First-degree murder is defined by statute as follows:
Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree.
G.L.c. 265, §1. Unarmed robbery is punishable “in the state prison for life or for any term of years.” G.L.c. 265, §19.
“The effect of the felony-murder rule is to substitute the intent to commit the underlying felony for the malice aforethought required for murder.” Commonwealth v. Matchett, 386 Mass. 492, 502 (1982); Commonwealth v. Moran, 387 Mass. 644, 649 (1982) (same). The felony-murder rule is not automatically applied without viewing the facts, and is not necessarily applicable to all felonies that can be punished by life imprisonment. Matchett 386 Mass. at 504. It does however apply automatically to all felonies that are inherently dangerous. Commonwealth v. Jackson, 432 Mass. 82, 89 (2000) (“If an offense is inherently dangerous to human life, commission of the crime that caused death constitutes first degree felony murder”). But, as recognized by the Supreme Judicial Court in Matched
A felony-murder rule that punishes all homicides committed in the perpetration of a felony whether the death is intentional, unintentional or accidental, without the necessity of proving the relation of the perpetrator’s state of mind to the homicide, violates the most fundamental principle of the criminal law — criminal liability for causing a particular result is not justified in the absence of some culpable mental state in respect to that result.
Matchett 386 Mass. at 506-07, quoting People v. Aaron, 409 Mich. 672, 708 (1980).
Matched addressed whether the crime of extortion could support a conviction for felony-murder, as it “may be committed in a way not inherently dangerous to human life.” Id. at 508. The Supreme Judicial Court held:
We hold today that when a death results from the perpetration or attempted perpetration of the statutory felony of extortion, there can be no conviction of felony-murder in the second degree unless the jury find that the extortion involved circumstances demonstrating the defendant’s conscious disregard of the risk to human life.
Matchett, 386 Mass. at 508.
Shortly after deciding Matched, the Supreme Judicial Court was faced in Commonwealth v. Moran, 387 Mass. 644 (1982), with the same felony-murder issue, but in the context of an underlying felony of unarmed robbery, as is the case here. The Moran Court stated: “Though Matched involved only felony-murder based on extortion, its principle applies as well to felony-murder based on unarmed robbery. Unarmed robbery is not inherently dangerous to human life.” Moran, 387 Mass. at 651. The Moran Court held: “where the underlying felony is unarmed robbery, the felony murder rule applies only if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life.” Id. See also Commonwealth v. Scott, 428 Mass. 362, 364 (1998) (unarmed robbery is not inherently dangerous to human life; “Felony-murder may only be premised on unarmed robbery if the Commonwealth proves that the defendant committed the felony with a conscious disregard for human life”).

3. Analysis

Starting with Moran, the Supreme Judicial Court has reviewed convictions for felony-murder based on unarmed robbery on three occasions pertinent to the issue before for this court. The application of the “conscious disregard of the risk to human life” standard in two of those cases is at least a starting point for this court.
In Moran, the two defendants met the victim outside a bar, briefly conversed, entered the bar, and had some drinks together. The victim left the bar and walked to his truck, followed by the defendants. A confrontation occurred. One or both defendants hit the victim several times about the head and placed him in his truck. The victim was intoxicated, and because of that, a recent meal, the blows to the head, and the position of the victim’s body in the truck, the victim vomited during the night, aspirated the vomit, and was asphyxiated. Moran, 387 Mass. at 645-46. The defendants were charged with felony-murder based on unarmed robbery. Because of an erroneous jury instruction, the Supreme Judicial Court reversed the murder convictions and did not address the issue of whether a properly instructed jury could have found that the defendants acted with conscious disregard for human life.
In Commonwealth v. Plunkett, 422 Mass. 634 (1996), the victim was found dead in his apartment. He had been bound and gagged, with his hands tied behind his back, and a towel tied around his face. His diamond ring was missing. A T-shirt had been partially stuffed into his mouth and tied around his head, causing his tongue to be forced into an “up” position, and blocking his upper air passages and causing his suffocation within one hour of being gagged. Id. at 636. The defendant was convicted of felony-murder based on unarmed robbery. The Court concluded: “The evidence warranted a finding that the defendant committed an unarmed robbery with a conscious disregard for the risk to the victim’s life . . .” Id.
In Commonwealth v. Scott, 428 Mass. 362 (1998), the defendant was convicted of felony-murder based on unarmed robbery, although both armed and unarmed robbery were charged. In that case, a small *548 drug deal had gone bad. The defendant sold the victim baking soda, instead of cocaine, and the victim had paid for it with a counterfeit $20 bill. The defendant chased the victim and struck him in the face while the victim was still in his truck. The victim fled the truck and was pursued by the defendant, who hit the victim several more times. As the defendant continued to strike the victim, two of the defendant’s friends joined in, one kicking the victim and the other stabbing the victim. The victim was found by the police in an unresponsive state, bleeding, and laying on the ground. The victim died of stab wounds after being rushed to the hospital. The Court summarized the evidence to include the following: “He (defendant) pursued the victim and forced the victim to stop his truck . . . approached the victim . . . hit him in the face . . . the victim attempted to flee, he continued to strike the victim ... he continued the assault as two acquaintances joined in, knowing that one of the acquaintances customarily carried a knife ... he realized the victim was being stabbed . . . and then fled leaving the dying victim in a dark, unfamiliar street.” The Court found: “The defendant’s conduct, even in a light most favorable to him, evinces a conscious disregard of the risk to human life.” Id. at 365.
Besides the above felony-murder cases, some manslaughter cases provide guidance for this court in attempting to quantify what is meant by conscious disregard of the risk to human life. These cases make clear that the Supreme Judicial Court is intent on having sensible, concrete distinctions between the crimes of manslaughter and murder. See Commonwealth v. Sneed, 413 Mass. 387, 393 (1992) (“we appropriately make criminal liability and punishment for an act proportionate to the actor’s moral culpability for that act”).
Prior to the Supreme Judicial Court’s decision in Commonwealth v. Catalina, 407 Mass. 779 (1990), the law in this Commonwealth defined involuntary manslaughter as an unlawful homicide, unintentionally caused: (1) in the commission of an unlawful act, malum in se, not amounting to a felony nor likely to endanger life (“unlawful act manslaughter”); (2) by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct (“wanton or reckless manslaughter”); and (3) in the commission of a battery (“batteiy-manslaughter”). Id. at 783-84. The Catalina Court recognized the possible unfairness of “unlawful act manslaughter,” which could result in punishment for a fortuitous result merely because the act was unlawful. Id. at 786. The Catalina Court abandoned unlawful act manslaughter, except in cases where a battery causes death. The Court preserved battery-manslaughter because in such cases “the defendant is, or should be, cognizant of the fact that the battery he is committing endangers human life." Id. at 787. See also Catalina, 407 Mass. at 784 (battery-manslaughter “recognizes the danger inherent in the intentional infliction of bodily harm associated with a criminal battery”). The Court specifically declined to redefine unlawful act manslaughter in terms of mental state, such as it did with felony-murder in Matchett, because it wanted a jury to be able to differentiate sensibly between manslaughter and murder. Id. at 788.
“After Matchett and Catalina, therefore, felony-murder and battery-manslaughter could be differentiated according to the inherent danger posed by the defendant’s conduct.” Commonwealth v. Fortes, 47 Mass.App.Ct. 214, 218 (1999). Battery-manslaughter requires “a high degree of likelihood that substantial harm will result to another.” Id., quoting Sneed, 413 Mass. at 394. Felony-murder, based on non-inherentty dangerous felonies, requires “a conscious disregard of the risk to human life.” Matchett, 386 Mass. at 508; Moran, 387 Mass. at 651. In Sneed, 413 Mass. at 394, the Supreme Judicial Court identified the risk of physical harm in a manslaughter case (both prongs remaining after Catalina) as “a high degree of likelihood that substantial harm will result to another,” and characterized it as expressing a level of risk of physical harm below those levels that must be shown for a conviction of murder in the first degree based on felony murder (“conscious disregard of the risk to human life”) and on the basis of third prong malice (“plain and strong likelihood that death would follow the act”). The teaching of Catalina and cases such as Sneed is that: (1) there is an intentionally created and sensible distinction that juries must be able to draw between the manslaughter requirement of a high degree of likelihood that substantial harm will result to another, and the felony-murder requirement in unarmed robbery cases of conscious disregard of the risk to human life; and (2) the felony-murder standard is a higher standard than the manslaughter standard, requiring a more culpable state of mind.
The only case brought to the court’s attention that involved a single punch causing death is Commonwealth v. Sheppard, 404 Mass. 774 (1989). The defendant in Sheppard committed what the jury found to be an unarmed robbery, taking T-shirts from a man named Hamilton. Later that evening, Hamilton and a friend, Larrier, encountered the defendant and a confrontation occurred. The defendant punched Larrier in the face, causing him to fall backward and hit his head. Larrier died four days later as a result of a hemorrhage caused by a severe fracture to the skull. Id. at 775. The defendant was charged with and convicted of manslaughter.[4] The Court in Sheppard, which was decided shortly before the Court’s decision in Catalina, upheld the manslaughter conviction, concluding “the evidence that the defendant called the blow ‘a knockout punch,’ the jury’s finding of an intentional batteiy done ‘with such violence that harm [was] likely to *549 result’ was a sufficient basis to support the manslaughterconviction."Id. at 777.
Another manslaughter case, Commonwealth v. Junta, 62 Mass.App.Ct. 120 (2004), warrants mentioning. Junta was charged with manslaughter after a confrontation with a man named Costin at a hockey rink after an informal hockey practice involving their respective sons. Costin died the following day as a result of the injuries inflicted by Junta. The defense considered the number of blows inflicted to be a “crucial issue” at trial. The Appeals Court characterized the defendant’s apparent reason for concern as follows: “Thus, if only a single punch or only minor blows were involved, this would tend to negate the defendant’s knowledge or imputed knowledge that he was endangering human life.” Id. at 122. The importance of Junta is that it is a suggestion that the number and/or force of blows causing death is a pertinent factor, and perhaps a crucial factor, in evaluating a defendant’s mental state and level of culpability.
Turning now to the issue for decision by this court, it is best to specifically frame the issue in the context of the McCarthy standard this court will apply. The McCarthy standard requires that this court determine whether the grand juiy heard sufficient evidence to support a finding of probable cause to arrest Lopez for first-degree murder/felony-murder on the basis of the unarmed robbery of Nguyen. The court will focus on the evidence heard of Lopez’s conduct, because if probable cause to arrest Lopez for felony-murder was not established before the grand juiy, Ramos, who is charged only as a joint venturer/aider and abettor, will receive the benefit of that ruling.
The grand jury heard ample evidence to conclude that Lopez planned and committed the unarmed robbery, and that his assault of Nguyen caused Nguyen’s death. The determinative question for this court is whether the grand jury heard sufficient evidence upon which it can be found under the McCarthy probable cause standard that Lopez committed the robbeiy with a conscious disregard of the risk to human life. The court concludes that the evidence of Lopez’s mental state heard by the grand jury is insufficient under McCarthy to support an indictment for first-degree murder under the felony-murder rule.
There is no credible argument that Lopez acted with an intent to kill, nor need there be such an intent under the felony-murder rule, which essentially transfers the intent from the underlying felony to satisfy the malice requirement of murder. Lopez’s admissions to Croché and Elswick are highly inculpatoiy on the unarmed robbery charge, but if anything, cut against a finding that he acted in conscious disregard of the risk to human life. However tragic the outcome, Lopez simply acted to rob Nguyen of food and money. This is not a case where a defendant administered a beating, and then robbed the victim as an afterthought. Lopez’s intent to rob was formed well before the blow was struck. His admissions do not suggest any more sinister motive than to assault Nguyen with sufficient force to rob Nguyen of the food and money Nguyen was carrying.
Lopez’s mental state intent is best measured by his conduct, in this case, by the violence he used against Nguyen in order to rob Nguyen of his money and the food he was delivering. No weapon was used, despite testimony that some (not Lopez) among the youths gathered at the corner of Osgood Street carried bats. Only Lopez was involved in the assault of Nguyen. Although there were others present, the grand jury heard that only Lopez assaulted Nguyen. Apparently Lopez believed that he, without the help of others, and without a weapon, could relieve Nguyen of his money and food. Only a single punch was thrown. Nguyen was struck only once, apparently with Lopez’s closed fist. Obviously, the punch was tragically well-placed, and probably forceful, although there was no evidence presented to the grand juiy that the punch caused any broken facial bones. What the punch did do was knock Nguyen straight backwards, or alternatively, cause him to lose his balance and fall straight backwards, so that his head slammed against the sidewalk, causing his death a day later.
This court finds that the grand juiy did not hear sufficient evidence to support a finding that probable cause existed that Lopez acted with a conscious disregard of the risk to human life when he swung his fist and struck Nguyen in the face.[5] Although this case is proof, as is Sheppard, that a single blow is capable of causing death, the court still concludes that a single punch causing death is an extremely rare occurrence. As an extremely rare occurrence, and considering all the evidence heard by the grand juiy, this court cannot find that the grand juiy heard sufficient evidence to find probable cause that Lopez acted with a conscious disregard of the risk to human life by striking Nguyen once in the face.[6]
The appellate cases that have examined the sufficiency of evidence regarding the conscious disregard standard for felony-murder provide some guidance for this court. Moran never reached the sufficiency question, but the facts suggest to this court a far greater culpable mental state than presented in this case. Plunkett reached the issue, but the facts were more egregious than those before this court. The victim was left bound,' his hands tied behind his back, and gagged. He suffocated within one hour of being left by the defendant in an apartment, with no one likely to find him. Even given that, the Court found the conclusion that the defendant acted with a conscious disregard of the risk to human life warranted, but not compelled. Plunkett, 422 Mass. at 639. In Scott, the Court found conduct that evinced a conscious disregard of the risk to *550 human life, but those facts differ markedly from this case and reflect, in this court’s view, a more culpable state of mind. In Scott, the defendant pursued the victim after the initial assault, continued to strike the victim, and continued the assault as two acquaintances joined in to beat upon the victim, one of whom the defendant knew customarily carried a knife. Scott, 428 Mass. at 365. The defendant knew during the assault that the victim was being stabbed, but only broke off the assault when another friend approached and intervened, and then fled leaving the victim bleeding on the street.[7] Id.
None of the decided cases present a set of circumstances similar to this case. However, and more importantly, none of the cases present, in this court’s view, less compelling facts found sufficient to satisfy the conscious disregard standard. In each case, this court views the facts found sufficient to satisfy the conscious disregard standard as more egregious and reflective of a more culpable state of mind than the facts heard by the grand jury in this case.
Although quantifying the conscious disregard standard is difficult in the abstract, the Supreme Judicial Court has compared the mental state required for manslaughter to the mental state required for this form of felony-murder and has found that: (1) an important distinction exists; (2) the distinction must be able to be sensibly applied by juries; and (3) the felony-murder standard is greater (requiring a more culpable mental state) than that required for manslaughter in a significant enough way so that juries will be able to understand, recognize, and apply the difference. Assuming for a moment that Lopez’s conduct exhibited a high degree of likelihood that substantial harm would result to Nguyen, this court does not see Lopez’s conduct as so easily satisfying the battery-manslaughter standard so as to find that it also satisfies, under McCarthy, the greater and more stringent conscious disregard standard required for felony-murder based on unarmed robbery.

ORDER

Defendants’ motions to dismiss are ALLOWED, without prejudice to further action by the grand jury not inconsistent with this memorandum.

The decision herein pertains only to the first-degree murder indictment and does not affect the unarmed robbery indictments, which remain as returned by the grand jury. Ramos (but not Lopez) has also moved, on the basis of McCarthy, to dismiss the unarmed robbery indictment against him. The court will address that motion in a separate memorandum at a later time.

The grand jury also heard that Lopez made a similar admission to the mother of his two-year-old son, to the effect: “I hurt somebody. And if you want to know you can look at the Eagle Tribune, the Chinese delivery man.”

Labarge testified that someone, not clearly identified, had spoken to a maintenance worker in the Lawrence Housing Authority and “he” had heard that Ronny Dukes (Ramos’s street name) had done it. Labarge was responding to a question from a grand juror and was explaining how it was that he contacted Ramos. This court does not accept that hearsay information as contributing toward probable cause.

The unarmed robbery and the confrontation were separate incidents, distinct in time. Thus, the Commonwealth could not charge first degree felony-murder based on the charged unarmed robbery.

The Commonwealth argues that it is premature for this court to assess the sufficiency of the evidence in this case and that the court should defer the sufficiency issue to the time of trial for determination by the trial jury, subject of course to Rule 25 motions for required findings of not guilty. Although that is the' general practice to follow, the McCarthy standard still needs to be satisfied by the presentation to the grand jury. This case is particularly capable of being decided under McCarthy because it is in fact a simple case factually. Lopez ordered Chinese food to be delivered to his location with an intent to rob the delivery person, and struck the delivery person with a single blow to the face to effect the robbery, causing the victim to fall backwards and strike his head on a concrete sidewalk, which caused the victim’s death. The sufficiency question is as well-framed at this time under the McCarthy standard as it would be under the more stringent Rule 25 standard at the conclusion of the Commonwealth’s evidence. If the evidence heard by the grand jury cannot satisfy the McCarthy standard, defendants should not be put to trial to await their assertion of their Rule 25 motions, particularly here, where they are held without bail and charged with first-degree murder, a crime punishable only by life imprisonment, without the possibility of parole.

The robbery was planned and was not “a crime of opportunity.” In this court’s view, that makes Lopez’s conduct more egregious, but not with respect to the conscious disregard standard. Sentencing arguments to this court often appropriately focus on whether a violent crime was planned or unplanned. But here, it is Lopez’s conduct in effecting his planned robbery by assaulting Nguyen with his fist, whether planned for thirty minutes or thirty seconds, that either establishes or does not establish that the unarmed robbery was committed with a conscious disregard of the risk to human life. That risk to human life, whatever it is, is no greater because Lopez brought Nguyen to Osgood Street than it would be if Lopez had formed his intent to rob upon seeing a delivery person arrive on Osgood Street to deliver food for a legitimate take-out order.

The Commonwealth argues that Lopez, like the defendant in Scott, left the victim in a life threatening condition, and that is true, at least in hindsight. But the rest of the assaultive conduct in Scott was far more egregious than is the case here. Additionally, the court does not read Scott to suggest that conscious disregard would not have been found except for the defendant’s flight. Moreover, leaving a bleeding stabbing victim to continue to lose blood without immediate medical attention is different than leaving Nguyen on the sidewalk. Nguyen was not bleeding, and the grand jury heard no evidence that Nguyen’s head injury worsened as he laid on the sidewalk. The evidence heard by the grand jury does not permit a fair inference that Lopez knew he was leaving a dying man on the sidewalk, or that prompt medical attention was needed to save Nguyen’s life, or that prompt medical attention would have saved Nguyen’s life. In fact, Trooper LaBarge testified that it was originally thought that Nguyen would survive his injury, until he took a turn for the worse the following day.