Lu, John T., J.
INTRODUCTION
The defendant, Mark Kerrigan (Mr. Kerrigan), is charged with manslaughter and assault and battery on an elderly or disabled person causing serious injury. G.L.c. 265, §13; G.L.c. 265, §13K(c). Mr. Kerrigan now moves to dismiss the manslaughter indictment claiming that the grand jury did not hear sufficient evidence to establish probable cause to indict and that the integrity of the grand jury was impaired. See Commonwealth v. O’Dell, 392 Mass. 445, 447 (1984); Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982).
Because the court concludes that the grand jury heard sufficient evidence to support the manslaughter *596 indictment where Mr. Kerrigan, during a fight with his seventy-year-old father, grabbed his father’s throat, fracturing the left cornu of his thyroid cartilage and eventually causing his death, and because the court further concludes that no plausible claim can be made that the integrity of the grand jury was impaired, the Court denies the motion to dismiss.[1]
BACKGROUND
Viewed in the light most favorable to the Commonwealth, the grand jury could reasonably have found the following facts. See Commonwealth v. Caracciola, 409 Mass. 648, 649 n.1 (1991).
During the early-morning hours of January 24, 2010, Stoneham police officers, paramedics, and a firefighter responded to a 911 call from Brenda Kerrigan requesting emergency medical assistance for her husband, Daniel Kerrigan, at 7 Cedar Avenue in Stoneham.[2] They arrived and found Daniel Kerrigan on the kitchen floor, unresponsive. Their attempts to revive him were unsuccessful, and Daniel Kerrigan was transported to Winchester Hospital, where he was pronounced dead.
Before entering the house, Paramedic Joseph Amello (Mr. Amello) looked through a window and saw two people, a male and an older female, passing a telephone back and forth. While Mr. Amello was tending to Daniel Kerrigan, Brenda Kerrigan asked what was going on and explained that she could not see anything because she was blind.
Brenda Kerrigan told Stoneham Police Officer Jonathan Mahoney (Officer Mahoney) that her son, Mr. Kerrigan, was also in the home and was downstairs, and that Mr. Kerrigan and Daniel Kerrigan had been fighting. When asked where the fight had taken place, Brenda Kerrigan pointed to a corner of the kitchen. Officer Mahoney observed three picture hooks on the wall and that the pictures that should have been on those hooks were on the kitchen counter. He also noticed that other pictures appeared off-center, including one that was next to the stairway leading to the basement.
Officer Mahoney and another officer went down to the basement and found Mr. Kerrigan crouching between a sofa and chair with his hands concealed. When Officer Mahoney approached Mr. Kerrigan, Mr. Kerrigan became very combative and stated that he would not go with the police. Officer Mahoney smelled alcohol on Mr. Kerrigan. After some struggle, during which one officer used pepper spray, police handcuffed Mr. Kerrigan.
Brenda Kerrigan told Sergeant David Thistle (Sgt. Thistle) that her son and husband had been yelling and shoving each other back and forth, and that her husband had fallen. Sgt. Thistle arrested Mr. Kerrigan and Officer Kenneth Bowdidge read him his Miranda rights. Mr. Kerrigan first indicated that he did not wish to speak with the police, but about one minute later he said he would tell them what happened. He said that he had gone upstairs to use the telephone and that his father had approached him. He said that the two began arguing and that he grabbed his father by the throat and pushed him, causing him to fall to the floor.
Telephone records showed twenty-one calls from the Kerrigans’ home to the cell phone of Paula Kerrigan, the wife of Mr. Kerrigan’s cousin, from 8:08 p.m. to 9:21 p.m. on January 23, 2010. Mr. Kerrigan had spent the day horseback riding with Paula Kerrigan. He had hurt his ankle and Paula Kerrigan took him to a local hospital, where he received a prescription for Vicodin. From there, they went to his parents’ home at 7 Cedar Avenue. Around 5:00 p.m., Mr. Kerrigan became belligerent and would not let Paula Kerrigan leave. Paula Kerrigan called her husband, who called Daniel Kerrigan and then the police. At some point, Paula Kerrigan struggled with Mr. Kerrigan and broke his cell phone. Paula Kerrigan turned off her cell phone and did not turn it back on until 3:00 a.m. on January 24, 2010. When she turned it back on, she had fifty-six text messages and seven voicemails from Mr. Kerrigan.
Brenda Kerrigan told Massachusetts State Police Trooper Kevin Murphy (Trooper Murphy) that she and Daniel Kerrigan had been eating dinner in Woburn on January 23, 2010, when Daniel Kerrigan received a telephone call from his nephew, Paula’s husband, asking if he could go check on Paula at 7 Cedar Avenue. When Daniel Kerrigan did not return, Brenda Kerrigan got a ride home from her sister-in-law, identified only as “Jean.” Jean went inside and watched television with Brenda Kerrigan and Daniel Kerrigan. Meanwhile, Mr. Kerrigan, who was apparently drunk, kept asking to use the telephone. Shortly after Jean left, Brenda Kerrigan turned on the upstairs telephone receiver which, apparently, had the effect of disabling the phone that Mr. Kerrigan was trying to use. Mr. Kerrigan became angry and wanted to know why the telephone was not working. An argument followed, which resulted in Daniel Kerrigan and Mr. Kerrigan wrestling with each other in the kitchen, near the top of the basement stairs. Mr. Kerrigan said to Daniel Kerrigan something to the effect of “what are you going to do, push me down the stairs?” The struggle ended with Daniel Kerrigan collapsing on the floor. Mr. Kerrigan leaned over Daniel Kerrigan and said, “He’s faking.” Then he said: “Dad, you have to get up. I love you so much.”
The medical examiner, Dr. Heniy Nields (Dr. Nields), performed an autopsy on Daniel Kerrigan’s body and observed a small abrasion on his chin, three faint abrasions on his chest, a faint contusion lower down on his chest, and several abrasions on his knees. During an internal examination of Daniel Kerrigan’s neck, Dr. Nields noted a fracture of the left cornu of his thyroid cartilage, which is part of the larynx. There *597 was some hemorrhaging around the fracture, indicating that it had occurred before death.
Dr. Nields opined that, to a reasonable degree of a medical certainty, the fracture was caused by being grabbed around the neck, and not by paramedics’ insertion of an intubation tube. Dr. Nields testified that Daniel Kerrigan had significant heart disease and opined that the cause of death was “cardiac dysrhyth-mia following physical altercation in a person with hypertensive and atherosclerotic cardiovascular disease.” Presented with a hypothetical mirroring the evidence, Dr. Nields opined that the injury to Daniel Kerrigan’s larynx was caused by “external compression” or “blunt impact” from another individual, and that the physical altercation precipitated his death.
DISCUSSION
I. Standard
In Massachusetts, “a court will not inquire into the quality of evidence heard by a grand jury unless ‘extraordinary circumstances’ are present.” Commonwealth v. Mathews, 450 Mass. 858, 873 (2008), quoting from Commonwealth v. Freeman, 407 Mass. 279, 282 (1990). Two such extraordinary circumstances where judicial inquiry is warranted are (1) when it is unclear that sufficient evidence was presented to the grand jury to support a finding of probable cause to believe the defendant committed the offense charged, and (2) when the defendant contends that the integrity of the grand jury was impaired. Commonwealth v. Mayfield, 398 Mass. 615, 619 (1986).
To obtain an indictment, the Commonwealth must, at a minimum, present the grand jury with sufficient evidence to establish the identity of the accused and probable cause to arrest him. McCarthy, 385 Mass. at 163. Probable cause to arrest requires more than a mere suspicion but something less than the evidence necessary to support a conviction. Commonwealth v. Roman, 414 Mass. 642, 643 (1993). Probable cause exists where the facts and circumstances within the police officers’ knowledge at the time of the arrest serve as “reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.” Commonwealth v. Stevens, 362 Mass. 24, 26 (1972), quoting from Beck v. Ohio, 379 U.S. 89, 91 (1964).
Dismissal of an indictment is warranted where the Commonwealth’s presentation of evidence is misleading in a way that compromises the integrity of the grand jury proceeding. O'Dell, 392 Mass. at 447. Dismissal is not justified merely by showing that that false or deceptive evidence was presented to the grand jury; rather, the defendant must show (1) that false or deceptive evidence was given to the grand jury knowingly or recklessly, for the purpose of obtaining an indictment; and (2) that the presentation of the false or deceptive evidence probably influenced the grand jury’s determination to hand up an indictment. Commonwealth v. Tavares, 27 Mass.App.Ct. 637, 639 (1989), citing Mayfield, 398 Mass. at 621-22. The Commonwealth is not required to present all exculpatory evidence to the grand jury. O’Dell, 392 Mass. at 447. “It is only when the prosecutor possesses exculpatory evidence that would greatly undermine either the credibility of an important witness or evidence likely to affect the grand jury’s decision, or withholds exculpatory evidence causing the presentation to be ‘so seriously tainted,’ that the prosecutor must present such evidence to the grand jury.” Commonwealth v. Wilcox, 437 Mass. 33, 37 (2002), quoting O’Dell, 392 Mass. at 447.
II. Sufficiency of the Evidence
A general indictment for manslaughter, as the Commonwealth obtained here, is sufficient to charge a defendant with involuntary manslaughter. Commonwealth v. Clark, 393 Mass. 361, 364 (1984). An indictment for involuntary manslaughter can be based on two theories: (1) an unintentional killing resulting from “a battery not amounting to a felony which the defendant knew or should have known endangered human life"; or (2) “wanton and reckless conduct causing death.” Commonwealth v. Sanna, 424 Mass. 92, 105 (1997), citing Commonwealth v. Pierce, 419 Mass. 28, 33 (1994). Wanton or reckless conduct is “intentional conduct . . . which conduct involves a high degree of likelihood that substantial harm will result to another.” Commonwealth v. Welansky, 316 Mass. 383, 399 (1944).
Mr. Kerrigan argues that evidence presented to the Grand Jury was insufficient under either theory of involuntary manslaughter. He contends that there was insufficient evidence that he knew or should have known that grabbing his father’s neck might endanger his life or that there was a high degree of likelihood that his actions would result in substantial harm. He emphasizes that he was not aware that his father suffered from extensive heart disease.
The court need not address the sufficiency of the grand jury evidence as to the whether Mr. Kerrigan knew or should have known that his battery endangered his father’s life, because it concludes that the evidence was sufficient to support the manslaughter charge under the theory that Mr. Kerrigan’s conduct was both intentional and highly likely to cause substantial harm. See Welansky, 316 Mass. at 399.
Contrary to Mr. Kerrigan’s contention, the Commonwealth was not required to present evidence that Mr. Kerrigan knew or should have known that his actions might result in death. See Commonwealth v. Life Care Ctrs. of Am., Inc., 456 Mass. 826, 832 (2010) (“[RJeckless conduct does not require that the actor intend the specific result of his or her conduct, but only that he or she intended to do the reckless act”). The Commonwealth was only required to present evidence establishing probable cause to believe that Mr. Kerrigan’s actions carried a high risk of substantial harm and that death, in fact, resulted. See Sanna, 424 *598 Mass, at 105; Welansky, 316 Mass. at 399. The grand jury heard testimony, during the course of a struggle, that Mr. Kerrigan grabbed his elderly father’s throat and caused him to fall to the ground. The grand jury was reasonable in concluding that applying pressure to an elderly man’s throat poses a high risk of substantial harm, regardless of whether the defendant is aware of the existence or extent of any pre-existing medical conditions that might worsen the harm. There was also sufficient evidence, in the form of Dr. Nields’s testimony, that the fight was a but-for cause of Daniel Kerrigan’s death.[3]
Mr. Kerrigan attempts to distinguish his case from other involuntary manslaughter cases in which, he contends, it was clear the defendant’s actions proximately caused the victim’s death. See, e.g., Commonwealth v. Fortes, 47 Mass.App.Ct. 214, rev. denied, 430 Mass. 1180 (1999). In Fortes, the elderly victim of a purse-snatching suffered a dislocated kneecap and died six days later from post-surgery complications, Id. at 215. The Appeals Court affirmed the defendant’s involuntary manslaughter conviction after concluding that the defendant, who had dragged the woman across the pavement while attempting to steal her purse, had “subject(ed) an elderly victim to a highly predictable risk of serious injury.” Id. at 216. Mr. Kerrigan argues that his manslaughter indictment cannot stand because his conduct was considerably less severe than the conduct in Fortes and the relationship between his conduct and Daniel Kerrigan’s death is far more attenuated. His argument misses the mark.
On a motion to dismiss an indictment, the Court does not inquire into whether the Commonwealth can establish beyond a reasonable doubt that the defendant’s actions amounted to wanton or reckless conduct or proximately caused the victim’s death. “[A] requirement of sufficient evidence to establish the identity of the accused and probable cause to arrest him is considerably less exacting than a requirement of sufficient evidence to warrant a guilty finding.” O’Dell, 392 Mass. at 451. See also Commonwealth v. Gallant, 453 Mass. 535, 541 (2009), citing K.B. Smith, Criminal Practice and Procedure §3.51 at 126-27 (3d ed. 2007) (“Probable cause [to arrest] does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.”); Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992) (probable cause to arrest not equivalent to prima facie case).
However, the grand jury must be presented with evidence on each element of the crime charged. Commonwealth v. Moran, 453 Mass. 880, 884 (2009).
Mr. Kerrigan also seeks to distinguish Commonwealth v. Friberg, 26 Mass. L. Rptr. 511 (Mass.Super. 2010) (Lu, J.), in which this court determined that there was sufficient evidence to indict Mr. Friberg for manslaughter where he struck his seventy-two-year-old mother on her arm with a telephone and she died the next day of an aortic disruption due to spiking blood pressure. Mr. Kerrigan relies on the evidence that Mr. Friberg, unlike Mr. Kerrigan, was aware that his mother suffered from a pre-existing cardiovascular disease. See id. at 512. Although this court noted Mr. Friberg’s awareness of his mother’s pre-existing condition in its decision, that fact was not essential to the analysis. This court observed: “It is not unreasonable for a grand jury to have found substantial harm, even death, foreseeable from striking an elderly person. Even if Mr. Friberg failed to ascertain the danger in striking an elderly person, or the precise mechanism of the substantial harm and death, ‘he cannot escape the imputation of wanton or reckless conduct in his dangerous act.’ ” Id., quoting Welansky, 316 Mass. at 398. Although a defendant’s knowledge of his victim’s pre-existing condition may increase the likelihood that his violent conduct was wanton or reckless, such knowledge is not a prerequisite to a finding that physical aggression against an elderly person creates a high degree of likelihood that substantial harm will result.
Mr. Kerrigan’s reliance on Commonwealth v. Lopez, 26 Mass. L. Rptr. 544 (Mass.Super. 2010) (Feeley, J.), is likewise misplaced. There, Justice Feeley determined that there was insufficient evidence to indict Mr. Lopez and his co-defendant for first-degree felony-murder where Mr. Lopez punched a food deliveryman in the face, causing him to hit his head on the sidewalk and die. Id. Mr. Kerrigan argues, as the defendants did in Lopez, that there was no evidence he specifically intended to kill or otherwise acted in conscious disregard of human life. Contrast id. at 544, 549.
Lopez is only relevant because it is an example of the application of the law of homicide in a case of alleged aggression against the elderly. The states of mind in Lopez are only applicable to charges of murder and felony-murder, respectively. See Commonwealth v. Judge, 420 Mass. 433, 437 (1995), and cases cited (manslaughter does not require proof of malice); Commonwealth v. Sires, 413 Mass. 292, 303-04 n.14 (1992) (acknowledging distinction between third-prong malice and wanton and reckless conduct amounting to involuntary manslaughter, based on degree of risk of physical harm that a reasonable person with defendant’s knowledge would recognize was created by particular conduct). There is no indication that the victim in Lopez was elderly.
The Appeals Court’s decision in Commonwealth v. Junta, 62 Mass.App.Ct. 120 (2004), is also unavailing to Mr. Kerrigan. There, the Appeals Court upheld Mr. Junta’s involuntary manslaughter conviction stemming from an incident in which he struck the victim multiple times following an argument at a hockey practice, causing the victim to die from blunt head and neck trauma. Id. at 122-23. Contraiy to Mr. Kerrigan’s contention, the Appeals Court did not state that the *599 number of blows inflicted was a crucial issue at trial; rather, it observed that “[t]he number of blows inflicted was viewed as crucial by the defense.” Id. at 122. The court quoted Commonwealth v. Sires, which held, “The law of this Commonwealth recognizes unlawful-act manslaughter only if the unlawful act is a battery not amounting to a felony, when the defendant knew or should have known that the battery he was committing endangered human life.” Id., citing Sires, 413 Mass. 292, 302 n.10 (1992). The court added, “If only a single punch or only minor blows were involved, this would tend to negate the defendant’s knowledge or imputed knowledge that he was endangering human life.” Id.
This language tracks only the first theory of involuntary manslaughter — "a battery not amounting to a felony which the defendant knew or should have known endangered human life." See Sanaa, 424 Mass. at 105. Putting aside that Junta involved an appeal from a conviction, and not a motion to dismiss, Junta does not address the theory of involuntary manslaughter that punishes “wanton and reckless conduct causing death.” See id. Nothing in Junta suggests that a single violent blow or grab negates a defendant’s imputed knowledge that his conduct “involves a high degree of likelihood that substantial harm will result to another” for purposes of sustaining a manslaughter indictment. Welansky, 316 Mass. at 399.
Because the evidence presented to the grand jury established probable cause to believe that Mr. Kerrigan engaged in “wanton and reckless conduct causing death,” as the case law defines that phrase, the Court denies Mr. Kerrigan’s motion to dismiss based on the insufficiency of the evidence.
III. Integrity of the Grand Jury
Mr. Kerrigan argues that the Commonwealth misled the grand jury by (1) failing to call Brenda Kerrigan as a witness, despite the fact that she was the only eyewitness; (2) exaggerating the extent of her blindness by improperly suggesting that she was completely blind; (3) exaggerating the seriousness of the fight between Mr. Kerrigan and his father by eliciting testimony that pictures had fallen off their hooks, while failing to present witnesses to testify as to whether the pictures had been on the wall earlier or whether glass from any of the pictures had broken; (4) distorting Mr. Kerrigan’s alleged admission that he had grabbed his father’s neck by asking leading questions of Officer Mahoney; and (5) failing to present evidence that Officer Mahoney had omitted from his police report Mr. Kerrigan’s statement that his father was “faking it."
There is no merit to Mr. Kerrigan’s argument that the Commonwealth was required to present Brenda Kerrigan as a witness. The Commonwealth presented her version of events through various witnesses who spoke to her. See Commonwealth v. St. Pierre, 377 Mass. 650, 654-55 (1979) (grand juiy evidence may consist solely of hearsay, even when better evidence is available). There is no indication that the grand jury witnesses fabricated or distorted Brenda Kerrigan’s statements, and the Commonwealth is not obligated to present evidence to the grand jury in the light most favorable to the defendant. See Commonwealth v. McGowan, 400 Mass. 385, 388 (1987). See also Commonwealth v. Silva, 455 Mass. 503, 511 (2009) (“The Commonwealth is not required to present evidence of so-called defenses or otherwise disprove such matters before the grand jury”); Commonwealth v. Donnelly, 33 Mass.App.Ct. 189, 200 (1992) (where undisclosed statements merely represent the conflicting view of witnesses, with no misrepresentation or distortion, dismissal of indictments is not required).
Nor did the Commonwealth imply that Brenda Kerrigan was completely blind or that she was an untrustworthy witness. On more than one occasion, the prosecutor asked witnesses if they were aware that Brenda Kerrigan was “legally blind,” inviting the grand juiy to infer from both the qualifier and her statements that she retained some ability to see. See Gr. Jury Tr., Vol. I, pp. 7, 37; Vol. II, p. 10. The Commonwealth’s heavy reliance on Brenda Kerrigan’s statements in obtaining the indictment — including statements that reflected Mr. Kerrigan’s apparent concern for his father following the struggle — also undercuts the argument that the Commonwealth improperly tried to diminish Brenda Kerrigan’s credibility.
Despite Mr. Kerrigan’s alternative theories as to how the pictures might have fallen off their hooks, the Commonwealth was not required to offer other, more innocent explanations for the condition of the pictures. See McGowan, 400 Mass. at 388. It was also not required to avoid leading questions. Although the use of leading questions in grand juiy presentations has occasionally prompted criticism, dismissal of an indictment is not warranted solely on this ground. See Commonwealth v. Martinez, 420 Mass. 622, 625-26 & n.4 (1995), abrogated on other grounds, Commonwealth v. Azar, 435 Mass. 675 (2002). Here, the use of leading questions did not amount to egregious prosecutorial misconduct that impaired the integrity of the grand jury proceeding.
The Commonwealth was not required to discredit Officer Mahoney by highlighting any discrepancies between his testimony and his police report. See Commonwealth v. Clemente, 452 Mass. 295, 314 (2008) (at the grand juiy, “the Commonwealth need not bolster the credibility of the witnesses, discredit them [indeed, there is no cross-examination], or present the myriad of detail that is offered at trial”). Any such discrepancies may, of course, be the subject of cross-examination at trial.
Because Mr. Kerrigan has not shown that the integrity of the grand juiy proceeding was impaired, the Court denies the motion to dismiss. See Mayfield, 398 Mass. at 620-22.
*600 ORDER
The defendant, Mark Kerrigan’s, motion to dismiss (paper #16) Count 1, the manslaughter indictment, is DENIED.

 The court’s denial of the motion only means that the Commonwealth presented enough evidence to the grand jury to justify Mr. Kerrigan’s indictment. Before the grand jury, Mr. Kerrigan (and nearly all defendants) do not have the opportunity to cross-examine, present evidence, or even to be present. In short, the court’s decision on this motion is a highly preliminary determination.

 A CD of the 911 call that was admitted as a grand jury exhibit indicates that Daniel Kerrigan was seventy years old. On it, Mr. Kerrigan is heard in the background.

 ‘There may be more than one proximate cause of death . . . and ... a pre-existing physical condition does not preclude criminal liability because the defendant ‘takes the victim as he finds him’ ” (citations omitted). Commonwealth v. Jackson, 78 Mass.App.Ct. 465, 2010 WL 5183958, at *4 n.5 (slip op.) (Dec. 23, 2010).